## STEEL CONST. CO. v. LOUISIANA HIGHWAY COMMISSION.

### No. 82.

District Court, E. D. Louisiana,
Baton Rouge Division.

March 21, 1945.

H. Payne Breazeale, of Baton Rouge, La,, and D. W. Strickland, and John W. Lapsley, both of Birmingham, Ala., for plaintiff.

Richard B. Montgomery, Jr., and Arthur B. Hammond, both of New Orleans, La., for defendant.

BORAH, District Judge.

### Findings of Fact

1. There exists in this case a diversity of citizenship and the amount involved far exceeds the jurisdictional amount.

2. The Steel Construction Company did not follow the administrative procedure outlined in subsections 1, 7 and 8 of Section 5, Division 1 of the contract, to correct the abuses alleged to exist in this case, but in most instances acquiesced in the requirements of the inspectors and/or resident engineer.

3. The Steel Construction Company only made general complaints and these were in most instances made after the work involved in the dispute had been performed in compliance with the request of the inspectors and/or resident engineer.

4. In some instances plaintiff protested during the work and put the resident engineer on notice that it would make a claim but in all instances plaintiff met the requirements of the inspectors and the resident engineer and performed the work demanded of it without ever submitting the matter or dispute to the State Highway Engineer for his ruling or decision.

5. During the progress of the work the State Highway Engineer received a few letters from the officers of the Steel Construction Company complaining generally about the unreasonable inspection requirements of his subordinates but in none of these letters did plaintiff request a ruling from the State Highway Engineer.

6. At no time during the progress of the work did the Steel Construction Company refer any of the disputed items to the State Highway Engineer and request a ruling thereon.

7. The Steel Construction Company did not obtain any extra work order or supplemental contract in respect to any of the items involved in this suit, nor did they request one from any of the highway engineers.

8. It was not until after the work was completed that any claim of any nature or kind was presented by the Steel Construction Company to the State Highway Engineer, and then a claim was presented by the attorneys for the plaintiff to the State Highway Engineer unaccompanied by any supporting evidence, statements, affidavits, or even arguments as to why the said State Highway Engineer should allow the claim.

9. The claim was not itemized or broken down until the very day this suit was filed against the Louisiana Highway Commission for recovery.

10. The State Highway Engineer gave consideration to the claim as presented and decided that plaintiff was not entitled to be paid any additional amounts in addition to that offered in the final check which it had refused to· cash.

11. The engineers and inspectors acted throughout in good faith. Fraud, bad faith or gross error on the part of the State Highway Engineer, the resident engineer or the inspectors is not alleged and the evidence adduced at the trial would not sustain such a charge.

12. The court finds that the balance due plaintiff on the final estimate amounts to $1,435.11; that of this amount $420 is in dispute; that defendant. tendered a check for $1,015.11 in payment of the balance due on the contract and withheld and deducted $420 as liquidated damages for 12 days' delay but that defendant did not put plaintiff in default for failure to complete the contract within the allotted time.

13. Inspector Senn did not reject rivets which were according to specifications and his inspection of the rivets was not unreasonable.

14. Inspector Senn did not require plaintiff to clean and paint steel in a manner not in accordance with the specifications. The inspection and requirements were reasonable as to cleaning and painting in the shop.

15. The defendant did not request or order plaintiff to sand blast the steel in lieu of cleaning it with rotary wire brushes.

16. Inspector Senn did not require steel to be loaded in a manner different from the requirements of the railway and his requirements were not unreasonable under the circumstances.

17. The inspection and requirements as to field painting by the Steel Construction Company and its subcontractor Carlson were not unreasonable under the circumstances.

18. The requirements of the State Highway Inspectors, including Roland and Baker, were not unreasonable in regard to the cutting out and replacing of field rivets. The inspectors did not order rivets cut out that were up to specifications.

19. Plaintiff did at the request of Erickson dig ditches and do some grading on the west approach to restore the grade to as good a condition as it was before plaintiff commenced operations.

20. In respect to the claim for reaming rivet holes the court finds that there were shop errors in punching and it was necessary to ream these mismatched rivet holes to get fair holes in which to drive the rivets and secure the connection.

21. The plaintiff has been paid for the extra ties which had to be replaced because of the settlement of the east and west railway abutments.

22. Plaintiff received payment for shims at the contractor's price which included the cost of labor and it was not due to the fault of the Highway Commission that these shims had to be placed under the tie plates at the curve transition point.

23. Plaintiff neither requested nor received any work order, supplemental agreement or written force account for the work of raising span 22. This work was done upon the order of Inspector Roland to permit him to inspect the bearing plate.

24. The realigning of the towers was not to correct surveying errors but was done under an agreement between Inspector Roland and plaintiff's General Superintendent Campbell in order to facilitate the plaintiff, and this agreement did not provide for extra compensation for this work and no written order was obtained.

25. The furnishing of bolts and pins was in accordance with the specifications and agreement between plaintiff's general superintendent and the resident engineer and plaintiff was paid for these items in accordance with the terms of the contract.

26. The court finds that all shims were paid for under the terms of the contract and that the plaintiff was required to furnish shims in no larger amount than was anticipated in view of the nature of this contract; that the shims were required because of errors in fabrication of the steel

and because of settlement in the foundations and not because of any error or negligence on the part of the highway engineers.

27. The court finds that any additional storage or expense of unloading steel was due to the delay in the preparation of the foundations by the superstructure contractor, the Uvalde Construction Company, and that the Steel Construction Company had full knowledge of Uvalde's construction schedule and knew when it commenced erection that it might be delayed by the superstructure contractor. The court makes the same finding in regard to the realigning of tracks.

28. The court finds that the Steel Construction Company requested through its president permission to commence the operation of erection earlier than the defendant had anticipated granting such authorization; that plaintiff had full knowledge of the conditions and of the progress of the work of Uvalde Construction Company and that the plaintiff started operations in full knowledge that it ran the risk of delay due to the Uvalde Construction Company's not completing the foundations sufficiently in advance to allow for the continuous erection of steel.

Division 1, Section 8, subsection 3 of the contract, provides in part as follows: "Each contractor shall be held responsible for any damage due by him or his agents to the work performed by another contractor and the Commission will not entertain any claims for damages or delays resulting from such operations."

29. The court finds that it was the obligation of the Kansas City Bridge Company to drill anchor bolt holes, railroad and highway abutments on piers 1 and 6 but that the resident engineer did not require it to do the work because of the small amount involved and the possibility of cumulative errors and he thought plaintiff would prefer not to take the chance of having to drill them out and replace them. Most contractors preferred to do it that way and if plaintiff preferred to take the chance and believed that this was extra work it should have requested a written extra work order or should have refused to drill the anchor bolt holes and appealed to the State Highway Engineer. The Kansas City Bridge Company advised plaintiff that it would not do the work and plaintiff did not raise its voice in protest until this suit was filed.

30. The court finds that any reaming out of rivet sets ordered by Inspectors Roland and Baker was not unreasonable and beyond the specifications.

31. The court finds that any delay in the furnishing of shim lists was not due to any negligence on the part of the highway engineers but was due to the fact that the foundations were not ready on the west approach and that as a matter of fact the furnishing of shim lists for small lots was to facilitate the plaintiff.

32. The court finds that plaintiff's shop detail drawings corrected an omission in the plans and showed the type of bolts which were to be used with permission of defendant in fastening checkered and wrought iron plates; that plaintiff knew that these plates had to be fastened, made no protest at the time and was paid for these bolts in accordance with the terms of the contract.

Division 1, Section 4, subsection 1 of the contract, reads as follows: "The intent is to prescribe a complete work or improvement which the Contractor undertakes to do, in full compliance with the contract. The Contractor shall perform all items of work covered and stipulated in the contract and perform extra work and shall furnish, unless otherwise definitely provided in the contract, all materials, implements, machinery, equipment, tools, supplies, transportation and labor necessary to the prosecution of the work. The Commission will not pay freight charges on any material furnished under this contract."

33. There was no delay on the part of the defendant in furnishing plans for span No. 13. Plaintiff knew that it had to secure the approval of the Y. & M. V. Railroad to erect that span and this was its responsibility, not the responsibility of defendant.

34. The court finds in regard to the claim for rental charges for machinery in the field, that this delay was not due to the furnishing of shim lists or to any negligence or delay on the part of the defendant's engineers, but was due to delay of the Uvalde Construction Company in placing the foundations on the west approach at the disposal of the defendant.

### Conclusions of Law.

1. The contract in suit specifically provides for an administrative procedure for the settlement of disputes concerning questions arising under the contract. To the

end that any arbitrary ruling or requirement of the inspector may be corrected there was imposed upon the plaintiff the duty of referring such disputes first to the resident engineer and if not settled then to the State Highway Engineer for his final decision.

2. It was under this contract clearly the implied intent of the parties that disputed questions arising during the progress of the work would within a reasonable time be ultimately referred to the State Highway Engineer for his final determination.

3. The administrative procedure set forth in the contract provided a complete and reasonable means of correcting the abuses alleged to exist in this case. It of course applies to disputes arising during the general progress of the work and does not apply to any extra work.

4. The contract in suit provided an administrative procedure for the settlement of disputes concerning questions arising under the contract, and having accepted and agreed to these provisions, plaintiff was not free to disregard them without due cause, accumulate large damages and then sue for recovery.

5. I find nothing in this record that suggests that there was any valid reason or justification for plaintiff's failure to pursue the procedure set forth in the contract and even if it could be said that the conduct of the resident engineer or his inspectors was so flagrantly unreasonable and so grossly erroneous as to imply bad faith, it would still follow that the appeal provisions of the contract had to be exhausted before relief could be sought in the courts.

6. Even if it be assumed that the time element was waived and that plaintiff followed the administrative procedure outlined in the contract, there still has been no showing such as would entitle plaintiff to go behind the judgment of the engineer for there is neither averment nor proof that the engineer has been guilty of fraud or of mistake so gross as to justify an inference of bad faith, or that he has failed to exercise an honest judgment.

7. The court holds, as a matter of law, that the contractor was obligated under the contract to dig the drainage ditches and grade the bridge site as requested by the resident engineer.

8. The court holds, as a matter of law, that under the contract there was a duty imposed upon the Steel Construction Company to obtain supplemental agreements or written extra work orders under Division 1, Section 10, subsections 3 and 4 of the contract, for any work done upon request of the resident engineer or an inspector which it did not believe came under the terms of the contract, and failure to do so precludes recovery.

9. The court holds that the contract provided for a complete work and that the contractor had no right to take advantage of any error or omission in the plans, and that, therefore, as a matter of law, plaintiff cannot recover for the work done in fastening the wrought iron and checkered plates.

10. The court holds that the defendant is not liable under the contract for the delays caused by other contractors and that this includes the delay caused by the Uvalde Construction Company and the Y. & M. V. Railroad and any subcontractor in the erection of pier 13 over the Y. & M. V. tracks. Nor does it lie in the mouth of plaintiff to complain about a condition that it was instrumental in creating.

11. Plaintiff is entitled to judgment in the amount of $1,435.11, the balance due on the final estimate, together with interest at the rate of five per cent. per annum thereon from December 21, 1939 until paid. In all other respects plaintiff's claim is denied and rejected.

12. Of the twenty-six items involved in this controversy, only one, relating to the balance due on the final estimate, has merit, and the greater portion of that item was not in controversy. I think nine-tenths of this record is fairly attributable to matters in which the plaintiff has been unsuccessful, and that the costs should be apportioned on the basis of ninety per cent. against the plaintiff and ten per cent. against defendant.

On August 3, 1937, plaintiff was awarded a contract by the Louisiana Highway Commission for the construction of the superstructure of the approaches of the Mississippi River Bridge at Baton Rouge, Louisiana. Under the terms of this contract plaintiff agreed and bound itself to furnish and deliver all materials and equipment and to perform and furnish all labor necessary for the satisfactory completion of the proposed improvement on or before the expiration of 320 working days after receipt of written notice to proceed. Work was commenced

on April 7, 1938, and was finally completed on October 9, 1939, in 350 working days. During this period plaintiff received two extensions aggregating 18 days and for the 12 days' net delay in contract completion it was assessed liquidated damages at the rate of $35 per day, or a total of $420.

During the progress of the work plaintiff received the sum of $1,476,823.23, and on December 21, 1939, was tendered a check in the amount of $1,015.11 as payment of final estimate on this contract. Plaintiff refused to accept this check and it was returned because defendant had withheld and deducted $420 for liquidated damages and because plaintiff had other matters which it expected to take up with defendant within a few days.

On March 25, 1940, plaintiff, through its attorneys, presented for the consideration of the Louisiana Highway Commission a claim for $181,704.20. This claim was detailed as follows: Cost of extra work and delays caused in shop by Louisiana Highway Commission Inspectors, $115,097.97; Extra work and delays caused in field by highway commission inspectors, $66,606.23.

Upon receipt of this claim Mr. Henderlite, the State Highway Engineer, replied that his office had no knowledge or information which would permit an analysis of the claim as only the gross amounts were described and plaintiff was advised that a study would be made of the claim if and when presented in such detail as to permit a determination of its correctness in accordance with the governing specifications. In presenting this claim it was suggested that those parts of the specifications deemed applicable be recited in support of each particular item or group of items. In a followup letter Mr. Henderlite advised the attorneys for plaintiff that his prior letter was not to be interpreted as a refusal to consider the claim which they had presented in their letter of March 25th.

On May 6, 1940, the attorneys for plaintiff addressed the following communication to Mr. Henderlite:

"In response to your letter of April 26, and agreeable to the Steel Construction Company, I am handing you herewith a 'break-down' on the seven items of the claim of Steel Construction Company against the Louisiana Highway Commission for your further consideration and attention.

"Under instructions from the company and simply in order to protect their claim legally, as it has arisen under the present Louisiana Highway Commission Administration, we are today filing suit in the Federal Court on this account and assure you the matter will be left without action until we hear from you further after you have had an opportunity to consider the 'break-down' herein submitted."

From this letter, and this letter alone, the court knows that the two items in plaintiff's claim aggregating $181,704.20 were broken down into seven items but the "break-down" is not in evidence and the court does not know whether or not this claim was presented in the form and manner suggested by the State Highway Engineer or whether or not it involves the same items that are presently before the court for consideration.

The present action involves the same two items that comprised the claim which plaintiff presented to the State Highway Engineer, with this difference, that the cost of extra work and delays in the field is $280 less than the amount asserted in its claim. As grounds for recovery it is alleged: "That from the time Plaintiff first began its work on the project and under the contract and continuously during the entire progress thereof, the defendant, through its Engineer, its inspectors and assistant and special engineers, so interfered with, hampered and impeded the plaintiff in completing its part of the project and has been so unreasonable and unjustified in its requirements of plaintiff that a direct loss and damage to plaintiff resulted therefrom amounting to the full sum of One Hundred Eighty-one Thousand Four Hundred Twenty-four and 20/100 ($181,424.20) Dollars * * *."

On August 21, 1940, Henderlite advised plaintiff's attorneys by letter that Erickson, the resident engineer, had examined its claim for additional compensation on its contract and submitted his report and that the writer had reviewed the report and concurred in the recommendation that Steel Construction Company was not entitled to any payment in addition to that offered in the final check which it had refused to cash.

On September 13, 1940, plaintiff filed what it denominated a first amended complaint. This pleading sets forth a claim for damages in the amount of $226,261.06 and is somewhat unusual in that it does not refer to the original complaint in any particular and consequently does not in ex-

press terms purport to affirm, modify or amend any of the allegations previously made. In this pleading plaintiff's averments of claim are set forth as follows: In paragraph 4 the amount of $1,435.48 is claimed as the balance due on the final estimate. In paragraphs 5, 6, 7, 8, 9 and 11 and in respect to each of the seventeen items there enumerated it is alleged that during the progress of the work and at the special instance and request of defendant plaintiff furnished labor and material which was not required by the contract and specifications. The same general allegations are made with respect to the four items enumerated in paragraph 12, except that it is not there alleged that this special and additional work was not required by the contract and specifications. In paragraph 14, which deals with the painting and cleaning of the steel on said project, there are two subparagraphs. In subparagraph (a) and in respect to the two items there enumerated it is alleged that during the progress of the work and at the special instance and request of the defendant plaintiff furnished extra and additional labor and materials in excess of the usual and customary requirements for contractors. In paragraph 10 it is alleged that the defendant estimated shims as carbon steel for the purpose of payment, but due to the fact that the shims were fabricated in small lots and at different times their reasonable value was 2¢ per pound in excess of the contract price, and plaintiff is entitled to be paid the additional sum of $1,262.46. In paragraph 13 it is alleged that defendant's engineers and inspectors hampered and impeded plaintiff in the prosecution of its work in thirteen particulars, which resulted in direct loss and damage to plaintiff of $71,970.04. This sum is allegedly made up of two items; plant use $50,000, and equipment charges $21,970.04. And finally in paragraph 14(b) it is alleged that defendant's inspectors and engineers wrongfully hampered and impeded plaintiff in the cleaning and field painting of the steel in nineteen particulars, and that the additional cost to plaintiff was $37,898.38.

From this analysis of the complaint as amended it is apparent that the claim in suit involves not seven items which total the sum of $181,704.20 but twenty-six items which total the sum of $226,261.06. It is seemingly plain from the very nature of things that the claim in suit cannot be the self-same claim that was presented to the

engineer, though I am mindful of the fact that Henderlite said that it was, so far as he knew. From this analysis it also appears that the greater portion of plaintiff's claim is for extra and additional work some of which was required by the contract and specifications, some of which was not so required, and some of which was in excess of the usual and customary requirements for contractors, and that the remainder of the claim, excluding the amount claimed as the balance due under the contract, is for damage suffered by plaintiff by reason of wrongful interference by defendant in the performance of the contract or by reason of unnecessary, unreasonable and arbitrary inspections or requirements made by the defendant or its engineers or inspectors in the course of the performance of the contract by plaintiff.

■ The pleadings tell one story and the evidence another, and the court is unable to determine from the briefs on file whether plaintiff is in fact attempting to recover any of the disputed items on the theory that they involved extra work or whether or not its entire case rests on the theory set forth in the last clause of the preceding paragraph. Viewing the matter from either angle, I cannot on this record say that plaintiff has established the facts which it mistakenly believes are determinative of the questions here involved. As a matter of fact plaintiff has not even produced the witnesses, including its own executive officers, who this record reveals were in a position to admit or deny the extravagant charges set forth in the amended complaint. And such evidence as it did offer was in many respects inconsistent with the theory that the engineers and inspectors were guilty of the arbitrary abuses and exactions complained of. Having had the opportunity to see and observe the demeanor of every witness, save one whose testimony was taken by deposition, I experience no difficulty in reaching the conclusion that the inspectors on this job were fair and unprejudiced and that the engineers and inspectors acted throughout in the best of faith. Nor can I on this record say that plaintiff is entitled to recover on any of the disputed items on the theory that they constituted extra work. Division 1, Section 10, subsections 2 and 4 of the contract in suit specifically provide for payment and extra and force account work. It is expressly stipulated in subsection 4 that "extra work not covered by a Supplemental

Agreement or by a written Force Account order will not be paid for." And the evidence in this case is all one way and to the effect that plaintiff did not in respect to any of the disputed items request or obtain from any of the highway engineers an extra work order or supplemental contract. Highway Construction Co., Inc. v. City of Miami, 5 Cir., 126 F.2d 777.

 It has heretofore been noted that plaintiff is claiming the amount of $1,435.48 as the balance due on the final estimate, and I shall facilitate the further discussion by disposing of that issue now. Of the amount claimed only $420 is in controversy. Putting aside the extraneous contentions of the parties, the question for decision is whether or not the defendant had a right to assess and withhold this amount as liquidated damages. This question must be answered in the negative. The courts of Louisiana have repeatedly held in similar situations that the mere failure to complete the work within the time stipulated was a passive violation of the contract and did not render the contractor liable for damages until he was put in default. In the case at bar there is no allegation or showing that plaintiff was ever put in default or that it waived the putting in default. It follows that plaintiff is entitled to judgment in the amount of the sum withheld from it as liquidated damages, together with interest at the rate of five per cent. per annum thereon from December 21, 1939, the date this sum should have been paid. City of Baton Rouge, La., v. Robinson, 5 Cir., 127 F.2d 693; Davis v. Glenn, 3 La.Ann. 444; Godchaux v. Hyde, 126 La. 187, 52 So. 269; Herman Bros. v. Troxler, 166 La. 587, 117 So. 727; Haffner & Taylor v. Perloff, 174 La. 687, 141 So. 377; Article 1938, Revised Civil Code of Louisiana. Plaintiff is also entitled to interest on $1,015.11 from December 21, 1939, no legal tender having been shown and no payment into court having been made.

The provisions of the contract most pertinent to the decision of this case are set forth in Division 1, Section 5, subsections 1, 7 and 8, as follows:

"1. Authority of Engineer:

"The work shall be done under the direct supervision of the Engineer and to his satisfaction. The Engineer shall decide any and all questions which arise as to the quality or acceptability of materials furnished and work performed, manner of performance, rate of progress of the work, interpretation of the plans, and specifications, all questions as to the acceptable fulfillment of the contract on the part of the Contractor, disputes and mutual rights between Contractors on this project, and compensation. His decisions shall be final and he shall have executive authority to enforce and make effective such decisions and orders as the Contractor fails to carry out promptly. * * *

"7. Authority and Duties of Resident Engineer:

"The Resident Engineer shall be in direct charge of the work and shall have full authority, under the Engineer, in directing the proper performance thereof. * * * In case of any dispute arising between the Contractor and the Resident Engineer as to materials furnished or the manner of performing the work, the Resident Engineer shall have the authority to reject materials, or suspend the work until the question at issue can be referred to and decided by the Engineer. He shall not be authorized to revoke, alter, enlarge, relax or release any requirements of these specifications, or to approve or accept any portion of work, or to issue instructions contrary to the plans and specifications. Any advice which the Resident Engineer may give the Contractor shall in no wise be construed as binding the Engineer or the Commission in any way, or releasing the Contractor from the fulfillment of the terms of the contract.

"8. Authority and Duties of Inspectors:

"Inspectors employed by the Commission shall be authorized to inspect all work done and all material furnished. Such inspection may extend to all or any part of the work and to the preparation or manufacture of the materials to be used. An Inspector shall be stationed on the construction to report to the Resident Engineer as to the progress of the work and the manner in which it is being performed; also to report whenever it appears that the materials furnished and the work performed by the Contractor fail to fulfill the requirements of the contract, and to call to the attention of the Contractor any such failure or other infringement; but such inspection shall not relieve the Contractor from any obligation to perform all of the work in accordance with the requirements of the contract. In case of any dispute arising between the Contractor and the Inspector as to materials furnished or the manner of performing the work, the Inspector shall have

the authority to reject materials or suspend the work until the question at issue can be referred to the Resident Engineer. The Inspector shall not, however, be authorized to revoke, alter, enlarge, relax or release any requirements of the contract, nor to approve or accept any portion of the work, nor to issue instructions contrary to the plans and specifications. He shall in no case act as foreman or perform other duties for the Contractor nor interfere with the management of the work. Any advice which the Inspector may give the Contractor shall in no wise be construed as binding the Engineer in any way, or as releasing the Contractor from the fulfillment of the terms of the contract."

■ In these provisions the parties clearly set forth an administrative procedure for plaintiff to follow. To the end that any arbitrary ruling or requirement of the inspector may be corrected there was thus imposed upon plaintiff the duty of referring such disputes, first, to the resident engineer, and if not settled, then to the State Highway Engineer for his final decision. It was clearly the implied intention of the parties that disputed questions arising during the progress of the work would within a reasonable time be ultimately referred to the State Highway Engineer for his final determination. This procedure provided a complete and reasonable means of correcting the abuses alleged to exist in this case. It of course applies to disputes arising during the general progress of the work and does not apply to any extra work. Plaintiff accepted and agreed to these provisions but in most instances it acquiesced in the requirements of the inspectors and/or engineers and did not avail itself of the appeal procedure set forth in the contract. In some instances plaintiff protested during the work and put the resident engineer on notice that it would make a claim but in all instances plaintiff met the requirements of the inspectors and the resident engineer and performed the work demanded of it without ever submitting the matter or dispute to the State Highway Engineer. And at no time during the progress of the work did the plaintiff refer any of the disputed items to the State Highway Engineer and request a ruling thereon.

Furthermore it is to be presumed from the terms of the contract that both parties considered the possibility of disputes arising between them in reference to the execution of the contract and that in their minds was the possibility that the engineer might err in his determination of such matters. They chose to risk his judgment, and to rely upon their right to demand that the engineer should at all times exercise an honest judgment in discharging the duty imposed upon him. Consequently, to the end that the interest of neither party should be put in peril by disputes as to any of the matters covered by that agreement, it was expressly stipulated that the engineer's determinations should be final. The terms by which this power was conferred and the duty imposed are clear and precise leaving no room for doubt as to the intention of the contracting parties. They are susceptible of no other interpretation than that the action of the engineer was intended to be final.

■ Plaintiff finds itself in this rather anomalous situation. If it fails to show that the disputed matters were submitted to the engineer for decision in accordance with the administrative procedure agreed upon in the contract, it cannot, in the absence of a valid excuse, assert a claim for damages in this court. United States v. Blair et al., 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039. If, on the other hand, it shows that the disputed matters were submitted to the engineer for decision, it is confronted with the fact that it was expressly stipulated in the contract that the engineer's determination should be final. Knowing full well that none of these matters was referred to the engineer for decision during the progress of the work, plaintiff nevertheless attempted to show that it followed the administrative procedure outlined in the contract by proving that a claim, though not the precise claim in suit, was presented to the engineer and determined. But assuming without deciding that the time element was waived and that plaintiff followed the administrative procedure outlined in the contract, there still has been no showing such as would entitle plaintiff to go behind the judgment of the engineer, for there is neither averment nor proof that the engineer has been guilty of fraud or of mistake so gross as to justify an inference of bad faith, or that he has failed to exercise an honest judgment. Kihlberg v. United States, 97 U.S. 398, 24 L.Ed. 1106; Martinsburg & Potomac R. Co. v. March, 114 U.S. 549, 5 S.Ct.

1035, 29 L.Ed. 255; United States v. Gleason, 175 U.S. 588, 20 S.Ct. 228, 44 L.Ed. 284.

In the Blair case, supra, the respondent was awarded a contract by the United States to construct certain buildings at the Veterans' Administration Facility at Roanoke, Virginia. After completing the contract, respondent filed a claim with the Veterans' Administration for certain expenses including expenses alleged to have been imposed on him by the arbitrary, capricious and unfair conduct of government agents at the work site. The claim was rejected and a suit in the Court of Claims followed. The Court of Claims awarded respondent damages for extra labor and materials, excess wages and miscellaneous costs found to be the result of unauthorized acts, rulings and instructions of the Government superintendent and his assistant and also found that these acts, rulings and instructions were unreasonable and in many instances arbitrary, capricious and so grossly erroneous as to imply bad faith. In reviewing this judgment the United States Supreme Court used the following pertinent and appropriate language [321 U.S. 730, 64 S.Ct. 822]:

"Assuming without deciding that the actions complained of were unauthorized, unreasonable and arbitrary, we cannot conclude that recovery of the resulting damages was proper in this case. Article 15 of the contract in suit provides that all disputes 'concerning questions arising under this contract shall be decided by the contracting officer or his duly authorized representative, subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto as to such questions.' All of the items on which the recovery * * * was based were the subject of the 'disputes concerning questions arising under this contract.' Respondent appealed some of the decisions or instructions of the Government superintendent to the contracting officer, which resulted in at least one ruling favorable to respondent. As to the adverse rulings, however, respondent made no further appeal to the head of the appropriate department or his authorized representative. Moreover, the remaining items which were the subject of sharp dispute between respondent and the superintendent were not even appealed by respondent to the con-

tracting officer. And where the contracting officer could be said to have acquiesced in the superintendent's rulings, no attempt was made to appeal further to the departmental head.

"Respondent has thus chosen not to follow 'the only avenue for relief,' United States v. Callahan Walker Co., 317 U.S. 56, 61, 63 S.Ct. 113, 115, 87 L.Ed. 49, available for the settlement of disputes concerning questions arising under this contract. In Article 15 the parties clearly set forth an administrative procedure for respondent to follow. Such a procedure provided a complete and reasonable means of correcting the abuses alleged to exist in this case. Arbitrary rulings and actions of subordinate officers are often adjusted most easily and satisfactorily by their superiors. Furthermore, Article 15 provided the Government with an opportunity to mitigate or avoid damages by correcting errors or excesses of its subordinate officers. Having accepted and agreed to these provisions, respondent was not free to disregard them without due cause, accumulate large damages and then sue for recovery in the Court of Claims. Nor can the Government be so easily deprived of the benefits of the administrative machinery it has created to adjudicate disputes and to avoid large damage claims."

And in respect to the court's ruling that respondent was excused from following the procedure set forth in the contract, the Supreme Court found error and said:

"Even if the conduct of the Government superintendent or contracting officer, or their assistants, was so flagrantly unreasonable or so grossly erroneous as to imply bad faith, the appeal provisions of the contract must be exhausted before relief is sought in the courts. There was no finding or evidence that appeal to the head of the appropriate department or to his authorized representative would have been futile or prejudicial."

In the light of this decision and the views herein expressed it follows that plaintiff is entitled to recover the balance due on the final estimate and no more. The clerk is accordingly directed to enter judgment in favor of plaintiff in the sum of $1,435.11 with interest at the rate of five per cent. per annum from December 21, 1939 until paid.

■ Of the twenty-six items involved in this controversy, only one, relating to the

balance due on the final estimate, has merit, and the greater portion of that item was not in controversy. I think nine-tenths of this record is fairly attributable to matters in which the plaintiff has been unsuccessful, and that the costs should be apportioned on the basis of ninety per cent. against the plaintiff and ten per cent. against defendant.