**Anomi R. URSETH, Plaintiff,**

v.

**CITY OF DAYTON, et al., Defendants.**

No. C–3–84–103.

United States District Court,
S.D. Ohio, W.D.

Nov. 19, 1987.

Irving I. Saul, Dayton, Ohio, E. John Wist, A. Melvin Kemmer, Tipp City, Ohio, for plaintiff.

Neil F. Freund, Jane M. Lynch, J. Anthony Sawyer, Director of Law, City of Dayton Law Dept., Dayton, Ohio, for defendants.

DECISION AND ENTRY SUSTAINING DEFENDANT CITY OF DAYTON'S MOTION FOR NEW TRIAL ON THE ISSUE OF DAMAGES OR, IN THE ALTERNATIVE, FOR REMITTITUR; NEW TRIAL ON ISSUE OF DAMAGES GRANTED UNLESS, WITHIN STATED PERIOD OF TIME, PLAINTIFF ACCEPTS REMITTITUR TO SUM OF $1,650,000; DISCUSSION AND ORDER ON QUESTION OF ALLOCATION OF COSTS

RICE, District Judge.

A. INTRODUCTION

On August 4, 1986, a jury returned a verdict in favor of the Plaintiff and against the sole remaining Defendant, the City of Dayton, in the amount of $3,500,000, on that count of her Complaint seeking damages for the wrongful death of her husband, James Urseth. The Defendant filed a timely Motion for New Trial, or, in the Alternative, for a Remittitur (a reduction of the amount of the verdict) (Doc. # 208) on the ground that the verdict as returned by the jury is contrary to the weight of the

evidence, is excessive and is based upon passion and prejudice.[1]

At issue herein is the proper measure of damages recoverable under Ohio's relatively new (1982) wrongful death statute, Ohio Revised Code § 2125.02, which reads in pertinent part as follows;

(B) Compensatory damages may be awarded in an action for wrongful death and may include damages for the following:

(1) Loss of support from the reasonably expected earning capacity of the decedent;

(2) Loss of services of the decedent;

(3) Loss of the society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, suffered by the surviving spouse, minor children, parents, or next of kin;

(4) Loss of prospective inheritance, to the decedent's heirs at law at the time of his death;

(5) The mental anguish incurred by the surviving spouse, minor children, parents, or next of kin.

At the outset, this Court deems it fitting to express its conviction that there is no sum of money that can ever, in any way, ease the emotional trauma and distress or make a person whole for the reality occasioned by the loss of a loved one, particularly in a case such as this where that loved one met his death in such a violent, brutal, senseless and totally unnecessary manner. Neither the City of Dayton nor any municipality has sufficient funds in its treasury to accomplish this impossible feat.[2]

The issue before this Court, therefore, in determining the excessiveness (on the one hand) or the reasonableness (on the other)

of an award of damages in this or in any other case where wrongful death has been urged by a plaintiff and proven to the satisfaction of a jury, is not what amount of money damages will, in a subjective or emotional sense, compensate the survivors for the loss of a deceased (since that is an impossibility), but rather what sum of money, viewed objectively, is justified as compensation by the proof brought forth by the evidence at trial. In addition, while there may be those familiar with the facts of this case that would deem it more than appropriate to punish the City of Dayton for a "supervisory policy regarding the Organized Crime Unit of the Dayton Police Department [that] was so reckless or grossly negligent that future misconduct was almost inevitable or substantially certain to occur" (see Interrogatory No. 10 answered by the jury in the affirmative), the fact remains that the jury concluded that the supervisory policy in question was *not* the moving force behind the death of James Urseth (see Interrogatory No. 11 answered by the jury in the negative). The jury concluded only that the action of the Defendant City's employees wrongfully caused his death. Under the law, no matter how negligent, reckless or pernicious a city's conduct might be, a jury verdict may *not* include *any* amount (any dollar figure) for punishment. Punitive damages, regardless of how well deserved they might appear to be in a given case, cannot be awarded against a municipality such as the City of Dayton, either as a result of the city's action, inaction or the misconduct of its employees. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Damages against a municipality are limited to those proven necessary, by a preponderance or

---

1. Several other post-trial motions were filed, three by the Defendant (Doc. Nos. 202, 209 and 230) and one by the Plaintiff (Doc. # 211), and ruled upon by the Court (Doc. Nos. 235 and 253).

2. The measure of damages in tort cases is well established. "... [i]n tort ... cases, the basic objective of damages is the same—to make the injured party whole to the extent that that can be done." *Meadows v. Ford Motor Co.,* 510 F.2d 939, 943 (6th Cir.1975). The Ohio law is identical. *Pryor v. Webber,* 23 Ohio St.2d 104, 107, 263 N.E.2d 235, 238 (1970) ("In Ohio, as elsewhere, it is a rule of universal application in a tort action, that the measure of damages is that which will compensate and make the Plaintif whole."); see also Prosser, *Handbook of the Law of Torts,* 6 (4th ed., 1971), *quoting* Wright, *Introduction to the Law of Torts,* 8 Camb.L.J. 238 (1944).

greater weight of the evidence, to compensate those survivors recognized by law for the loss of the deceased.

In determining the amount of reasonable compensation (or whether the amount awarded by the jury is excessive), under the above referenced subsection of Revised Code § 2125.02, based upon the evidence brought forth at trial in this case, one is immediately faced with a twofold dilemma:

1. The statute, itself, in its present form, which greatly expanded the measure of damages for wrongful death, is so relatively new that there exists a dearth—a scarcity—of reported case law interpreting the measure of damages for wrongful death in the context of specific fact situations either in Ohio, in other states with similar statutes, or in the federal system where courts sitting in diversity jurisdiction are called upon to construe statutes similar to Ohio's; and

2. What decisions do exist, either in Ohio or elsewhere, are virtually useless, insofar as their applicability to this case is concerned, due to the reality that they are almost totally fact sensitive, i.e., there is no dispute as to the governing law—a plaintiff is entitled to "just compensation based upon proof establishing ... injuries and compensation with reasonable certainty," *Drayton v. Jiffee Chemical Corp.*, 591 F.2d 352, 362 (6th Cir.1978); the standard for determining the excessiveness of a verdict is the amount which, under the facts of the case, was the maximum that the jury *reasonably* could find to be compensation for the loss, *Manning v. Altec, Inc.*, 488 F.2d 127, 133 (6th Cir.1973)—the only question is how the *unique* facts of a given case are to be measured against that legal standard. In other words, since the facts, those bearing upon both liability and damages, differ from case to case, a reported decision concluding that a certain amount of money constitutes just compensation as damages within a given fact situation is of limited utility when attempting to determine just compensation (or, as is the case herein, whether a jury award of compensation is

excessive) in another, dissimilar fact situation.

## B. THE APPLICABLE LAW

"The proper role of the trial and appellate courts in a federal system in reviewing the size of a jury verdict is, ... a matter of federal law...." *Donovan .v. Penn Shipping Co.*, 429 U.S. 648, 649, 97 S.Ct. 835, 837, 51 L.Ed.2d 112 (1977); (*citing Hanna v. Plumer*, 380 U.S. 460, 466–469, 85 S.Ct. 1136, 1141–43, 14 L.Ed.2d 8 (1965); *Byrd v. Blue Ridge Rural Electric Coop.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958)). "As remittitur concerns the relationship between the federal judge and jury, it is a question of federal law." *Karlson v. 305 East 43rd Street Corp.*, 370 F.2d 467, 472 (2d Cir.1967). Indeed, there is a "strong federal policy against allowing state rules to disrupt the judge-jury relationship in the federal courts." *Byrd v. Blue Ridge Rural Elec. Cooperative, Inc.*, 356 U.S. 525, 538, 78 S.Ct. 893, 901, 2 L.Ed.2d 53 (1958) (state decisions holding that statutory defense which under state law must be decided by judge alone must give way to federal law which requires the factual issues raised by such a defense to be presented to and decided by a jury, since there is an affirmative federal policy favoring jury determination of disputed factual questions). The standard applicable to remittitur is governed by federal, not state law. *West v. Jutras*, 456 F.2d 1222, 1225 n. 6 (2d Cir.1972). As stated, *supra*, at 1152, a plaintiff is entitled to "just compensation based upon proof establishing ... injuries and compensation with reasonable certainty", *Drayton*, 591 F.2d at 362; the standard for determining the excessiveness of a verdict is the amount which, under the facts of the case, was the maximum that the jury *reasonably* could find to be compensation for the loss, *Manning*, 488 F.2d at 133.

Under federal law (as, for that matter, under state law), remittitur is not proper if the verdict was excessive *and* the result of passion and prejudice, since prejudice may well have affected the decision of the jury on liability, as well as upon damages. In those instances, a complete new trial is

required. 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2815, at 103 (1973). Presumably, if the verdict is merely excessive, i.e., not justified by or against the weight of the evidence, influenced or caused, perhaps, by sympathy but not by passion and prejudice, a remittitur as an alternative to an offer of a new trial on the issue of damages would seem to be a reasonable alternative. C. McCormick, *Handbook on the Law of Damages*, § 19, at 80–81 (1935).[3]

## C. THE JURY VERDICT IN THIS CASE WAS NOT THE RESULT OF PASSION AND PREJUDICE

In this Court's opinion, while the jury verdict on the issue of damages may be excessive and, therefore, not justified by and, accordingly, against the weight of the evidence, same is *not* the result of passion and prejudice, given the fact that the jury very carefully considered and answered each applicable interrogatory submitted to it and, in concluding that the Plaintiff had not prevailed on the civil rights claim set forth in the Plaintiff's Complaint, determined that the City of Dayton's supervisory policy regarding the Organized Crime Unit of the Dayton Police Department, while so reckless or grossly negligent that future misconduct was almost inevitable or substantially certain to occur, further determined that said supervisory policy was *not* the moving force behind the deprivation of any of James Urseth's constitutional rights resulting in his death (*see* Interrogatories 10 and 11 submitted to the duly empaneled jury). Had passion and prejudice been a factor in the jury's deliberations, this Court deems it sufficiently obvious to require no further comment that a

verdict would have been returned on *both* of the Plaintiff's claims set forth in her Complaint against the City. The Defendant's contention that the urging of Plaintiff's counsel that the jury "speak loudly" against the City of Dayton bespeaks a verdict infused with passion and prejudice is belied and simply unsupported by the seemingly methodical and discriminating manner with which the jury considered and answered the Interrogatories submitted to it, being careful to distinguish between the federal civil rights claim and the state claim for wrongful death. Accordingly, remittitur as an alternative to a new trial on the issue of damages (or such a new trial, should the remittitur not be accepted by the Plaintiff) will be this Court's remedy for a verdict deemed excessive.

## D. THE ISSUES PRESENTED

Was the $3,500,000 verdict returned by the jury excessive as against the weight of the evidence, as being beyond the maximum that the jury reasonably could have found to be compensation for the loss and, if so, what is the maximum amount that the jury reasonably could have found to be compensation to the survivors occasioned by the death of James Urseth?

## E. THE VERDICT OF $3,500,000 IS EXCESSIVE IN THAT IT EXCEEDS THE MAXIMUM AMOUNT THAT THE JURY COULD HAVE REASONABLY FOUND, BASED UPON THE EVIDENCE PRESENTED IN OPEN COURT, TO BE COMPENSATION FOR THE LOSS[4]

█ In this case, the Court finds that even if the facts set forth in Memorandum of Plaintiff Contra Motion for a New Trial

---

**3.** As indicated, state law would appear to be similar. "The court [in *Chester Park Co. v. Schulte*, 120 Ohio St. 273, 166 N.E. 186 (1929)] also stated that if the trial court in an action for unliquidated damages finds that the verdict is excessive *and* that it was rendered under the influence of passion or prejudice, it has no alternative but to set it aside and grant a new trial. If a verdict in an action for unliquidated damages is, in the opinion of the trial court, excessive, *but not* appearing to be influenced by passion or prejudice, the court may with the assent of plaintiff reduce the verdict by remit-

titur of any amount warranted by the evidence." *Littleton v. Good Samaritan Hosp. and Health Center*, No. 9872, 9886, slip op. at 26–27 (Montgomery Cty.Ct.App. May 28, 1987) (WESTLAW, OH–CS [1987 WL 11810]) (emphasis added).

**4.** This Court rejects, as wholly and totally misleading and inaccurate, the statements contained in Defendant's Reply Brief that:

1. "It has been repeatedly advanced by Plaintiff, and accepted by this Court, that because Defendant prevailed on one claim, the civil rights claim, no prejudice could have possibly

or, Alternatively, Remittitur (Doc. # 257) are accepted as true (although not necessarily the inferences drawn from those facts), the jury award of compensation is excessive in that it exceeds the maximum amount that the jury could have reasonably found, based upon the evidence presented in open court, to be compensation for the loss. There is simply insufficient evidence on the record to support compensatory damages in the amount of $3,500,000.

It must be noted that the size of the award, in and of itself, is not sufficient to establish excess and/or a finding of passion and prejudice. *See Larrissey v. Norwalk Truck Lines*, 155 Ohio St. 207, 222, 98 N.E.2d 419 (1951); *State ex rel. Stokes v. Probate Court*, 17 Ohio App.2d 247, 246 N.E.2d 607 (1969). Further, the Court agrees with the Plaintiff's assertion that no *dispositive* significance may be inferred in the relationship between the loss of Mr. Urseth's economic support (earning capacity, loss of services [5] and loss of prospective inheritance [6]) and the loss of his non-economic support (loss of society with all it entails and mental anguish). Indeed, the love, attention, and care bestowed by a man of modest means cannot be deemed less valuable than that bestowed by a millionaire. Obviously, however, the relationship between economic and non-economic

loss components of a jury verdict will be scrutinized carefully to make certain that the verdict represents objectively determined compensation as opposed to a figure that is excessive when considered in the light of the evidence introduced at trial.

It is *not* the relationship of the non-economic damages to the economic damages in the jury's award *alone* ($2,750,000 to $750,000, a relationship of 3.67 to 1) [7] which troubles this Court; rather, it is the relationship of the award of non-economic damages to the evidence on the record which is also and, quite frankly, most troublesome. As noted by the Defendant, if the $3,500,000 award were to be invested at a conservative rate of seven percent annually, the Plaintiff would receive income of $245,000 per year from this investment without depleting the principal, a sum in excess of six times Mr. Urseth's annual income. Of this $245,000, approximately $40,000 (a figure representing Mr. Urseth's yearly income) would constitute compensation for the loss of Mr. Urseth's earning capacity, while approximately $205,000 would constitute compensation for other elements of economic loss (loss of services and prospective inheritance) and for the so-called non-economic loss (loss of society and mental anguish). Even accepting, *arguendo*, the fact that the loss of Mr. Urseth's services was more

---

resulted to Defendant by the fact that the highest wrongful death verdict in this area, if not the state, was levied against it."

2. "The fact that the verdict is almost $3 million more than Plaintiff's expert testimony has also been argued. Again, Plaintiffs argue that the excessiveness of the award becomes irrelevant since the jury found in the City's favor on the civil rights claim. The Court has already accepted this argument...."

Defendant's Reply to Plaintiff's Memorandum in Opposition to Remittitur (Doc. # 260), at 2–3.

Having reread this Court's post-trial decisions on the plethora of motions filed by the parties, the undersigned can find no justification for these statements, save and excepting the possibility that Defendant's counsel, well educated, extremely ethical and honest, highly intelligent and superbly skilled in the lawyering trade, simply failed to read this Court's prior decisions as carefully as might have been warranted.

5. While "loss of services" as an element of damages under the wrongful death statute, Revised Code § 2125.02, could *arguably* be listed as a non-economic loss to the decedent's survivors,

this Court prefers, for purposes of this analysis, in view of the fact that the Plaintiff herself categorized this element of damages as an economic loss (Memorandum of Plaintiff Contra Motion for New Trial, or Alternatively, Remittitur, Doc. # 257 at 10), to consider "loss of services" as an economic loss.

6. The Plaintiff introduced no evidence suggesting a specific award of damages for loss of prospective inheritence to Mr. Urseth's heirs at law at the time of his death, Revised Code § 2125.02(B)(4), although she did consider same as an element of damages, along with lost earning capacity and loss of services, in concluding, Memorandum of Plaintiff Contra Motion for New Trial, etc., at 10, "[V]iewing the evidence most strongly to the Plaintiff, it is fair to state that the jury could have attributed at least $700,000 (or more) to the actual pecuniary loss suffered by the family through loss of support and loss of services (and the resulting prospective inheritance) as a result of the death of Mr. Urseth."

7. See fn. 8, *infra*.

than a minor consideration for the jury (and keeping in mind that no specific award was sought for loss of prospective inheritance), the annual award for loss of society and mental anguish is both substantial and unsupported by the evidence.

To put the above concept in another fashion, the Plaintiff has submitted that $700,000 is the least amount the jury could have attributed to the loss to the survivors of Mr. Urseth's earning capacity, loss of his services and the resulting prospective inheritance as a consequence of his death (Memorandum of Plaintiff Contra Motion for New Trial or, Alternatively, Remittitur, Doc. # 257, at 10). Since one must view the evidence most favorably to the verdict and/or award when ruling upon a motion for new trial, if one adds $50,000, representing loss of services, to the aforesaid $700,000 (if $700,000 is the least the jury could have awarded, then $750,000 is, by the Plaintiff's own definition, an even more reasonable figure), then subtracts the resultant sum of $750,000 from the jury verdict of $3,500,000, and then invests the remainder of $2,750,000 (representing loss of society and mental anguish)[8] at the same conservative rate of seven percent per annum, Mr. Urseth's survivors would realize annual income of $192,500 (without invading principal) for loss of his society and for their mental anguish, a figure almost five times his annual income and one that is likewise both substantial and unsupported by the evidence.[9]

There is ample testimony regarding the loss of of services and society suffered by Mrs. Urseth. The situation is different, however, with regard to the remainder of the Urseth family. Initially, *and most importantly*, this Court would point out that damages for loss of society of the decedent can be awarded to the decedent's children *only* if those children are *minors* at the time of the death. Revised Code § 2125.02(B)(3). All Mr. Urseth's children are adults at the present time and had reached the age of majority (18 years old or older) at the time of the death of their father.[10]

Accordingly, no damages can legally be awarded on behalf of the children of James Urseth for their loss of his society occasioned by the actions of the Defendant's employees.

Even were the Urseth children not statutorily barred from recovering for loss of their father's society, any award would be a comparatively small one, simply because there is less evidence relating to the loss of both society and services suffered by the remainder of Mr. Urseth's family. Mr. Urseth's children are adults. They are starting families of their own and, accordingly, will be less in need of his support, emotionally and financially, as time goes on. Mr. Urseth did enjoy a close relationship with his infant grandson who was a member of the household; however, under Ohio law, a grandchild is not considered a "next of kin", within the meaning of Revised Code § 2125.02(B)(3), for purposes of recovering for loss of a decedent's services, absent a legal obligation to provide support for said grandchild. *Bennett v. City of Cleveland*, No. 50479 (Ohio Ct.App., Cuyahoga Cty., June 5, 1986) [Available on WESTLAW, 1986 WL 6357] (LEXIS, States Library, Ohio file) (a case involving an aunt wherein the court stated "the General Assembly intended that the next of kin be allowed to

---

**8.** If $700,000, by Plaintiff's own estimate (raised to $750,000 by the Court), was awarded by the jury for loss of earning capacity, loss of services and loss of prospective inheritance, then only loss of society and mental anguish remain to be attributed to the remaining $2,750,000 of the verdict. Therefore, the ratio or the relationship of the non-economic damages (loss of society and mental anguish) to the economic damages (loss of earning capacity, loss of services and loss of prospective inheritance) in the jury's award is 3.67 to 1 ($2,750,000/$750,000).

**9.** As will be seen, *infra*, only the Plaintiff as surviving spouse is entitled to damages for loss

of her husband's society and for her mental anguish occasioned by the loss.

**10.** Testimony by the Plaintiff at trial established the fact that the eldest daughter was born in September, 1958 (making her 26 as of the date of the death of her father), that the middle child, a son, was 23 as of the time of the trial (making him at least 21 at the time his father was killed), and that the youngest child, a daughter, was 21 as of the time of the trial (making her at least 19 as of the date her father became deceased).

recover for loss of society and mental anguish only if there is no spouse, parent or minor child who qualifies," a holding, the rationale of which, in this Court's opinion, would apply to loss of services under subsection (B)(3) of Revised Code § 2125.02). While Mr. Urseth was aiding in the support of his grandchild, he was under no legal obligation to do so (nor, for that matter, was he under a legal obligation to support his adult, youngest daughter, the mother of the grandchild.). Additionally, much of the evidence at trial and much of the discussion in the Plaintiff's Memorandum Contra the Defendant's Motion at issue (Doc. # 257, 11–16) dealt *not* with prospective services or society, cut off or made impossible by the death of the father, but with that rendered or enjoyed in the past. While the past incidents are certainly circumstantial evidence of what the future might portend, that evidence is rebutted by the reality of grown children gone from the home and beginning families of their own. Accordingly, while Mr. Urseth still enjoyed an important role in his family, it was a diminishing role with regard to services and society insofar as his children were concerned.

There was of course testimony regarding the mental anguish suffered by Mrs. Urseth and her children and there is no doubt whatsoever that each member of the family suffered deeply as a result of the actions of the Defendant's police officers.

This Court is faced with a dilemma in that "[d]amages for loss of society and mental anguish are by their nature ineluctable and difficult to measure." *Littleton v. Good Samaritan Hospital and Health Center*, Nos. 9872, 9886, slip op. at 28 (Mont.Co.Ct.App.1987). Despite the evidence of loss of society and of mental anguish (the latter greatly augmented by the horrifying, needless manner in which Mr. Urseth met his death), the Court finds that the amount awarded for same by the jury ($2,750,000) is unreasonable. There is no evidence that the Urseth family's despair and anguish prevented them from gathering themselves together and continuing on with their lives. There is no evidence that psychological help was needed or sought or that any member of the family has difficulty in dealing with the ordinary demands of life. There is no evidence that any family member is not engaging in or is unable to engage in the same activity as before. The Urseth family has been disrupted, indeed, horribly so, but thankfully not destroyed.

Again, as was the case with the award of damages for loss of society, no damages can be awarded on behalf of the children of James Urseth for mental anguish because none of those children was a minor at the time the death of their father was directly and proximately caused by the actions of the Defendant's police officers. Revised Code § 2125.03(B)(5).

While the Court finds that the amount awarded by the Urseth jury is excessive, it does not find that this award was the result of the passion or prejudice of the jury. As previously stated, if such were the case, it is highly unlikely that the jury would have found against Plaintiff on her civil rights claim under 42 U.S.C. 1983. The Court does believe, however, that the circumstances surrounding Mr. Urseth's death aroused the sympathy of the jury. This sympathy may have influenced the jury to punish the Defendant as opposed to compensating the Plaintiff. Accordingly, the Court finds the award of damages to be clearly excessive in that it exceeds the maximum amount that the jury could have reasonably found to be compensation for the loss, based upon the evidence presented in open court.

F. HAVING FOUND THE VERDICT OF $3,500,000 TO BE EXCESSIVE IN THAT IT EXCEEDS THE MAXIMUM AMOUNT THAT THE JURY COULD HAVE REASONABLY FOUND TO BE COMPENSATION FOR THE LOSS, BASED UPON THE EVIDENCE PRESENTED IN OPEN COURT, THE COURT CONCLUDES THAT THE SUM OF $1,650,000 IS THE MAXIMUM AMOUNT THAT THE JURY REASONABLY COULD HAVE FOUND TO BE COMPENSATION TO THE SURVIVORS OCCASIONED BY THE DEATH OF JAMES URSETH

Merely because the evidence has been deemed insufficient to sustain a verdict of

some $2,750,000 for loss of society and mental anguish does not mean that the evidence adduced on those elements is either unsubstantial or insufficient to sustain a significant verdict on those elements of damages, albeit not in the amount returned by the jury.

### 1. Loss of Society With All It Entails

■ The Court has concluded, *supra* at 1156, that, "while Mr. Urseth still enjoyed an important role in his family, it was a diminishing role with regard to services and society insofar as his children were concerned." However, the fact remains that his role had neither diminished nor was diminishing at the time of his death with regard to his surviving spouse, Anomi Urseth. This Court accepts the Statement of Facts contained in the Plaintiff's Memoranda Contra the Defendant's Motion for New Trial or, Alternatively, Remittitur (Doc. # 257) at pp. 11–16, with reference to the loss to Anomi Urseth of the society and companionship, etc., of her deceased husband. These factual statements find support in the record of the evidence introduced at trial. In addition, however, the Court has likewise taken into account testimony reflecting the fact that, devoted husband that he may have been, Mr. Urseth did enjoy, and had enjoyed for many years, activities outside of the home (hunting, fishing, trapshooting, etc.) in which she was not a participant. Keeping in mind that compensation for loss of the society of the decedent may not be awarded on behalf of the Urseth children, since they were not minors at the time of their father's death, Revised Code § 2125.02(B)(3), there is, in this Court's opinion, ample evidence brought forth by the evidence at trial to conclude that a verdict of $300,000 to Anomi Urseth, the surviving spouse, on account of the loss of her husband's society and companionship is the maximum amount that the jury could have reasonably found on the issue of loss of society and companionship. This figure, unadjusted for present value, represents *approximately* $10,000 per year for each year of Mr. Urseth's remaining life expectancy.[11]

### 2. Damages for Mental Anguish

■ Initially, the Court must point out that no matter how real and how understandable may be the mental anguish of the decedent's surviving children, damages can only be awarded for mental anguish to *minor* children of the decedent. Revised Code § 2125.02(B)(5). The mental anguish of grown, non-minor children, no matter how severe, cannot, by the plain language of the statute, be the subject of an award of damages.

Regardless of the fact that no award of damages may be made for the mental anguish of the decedent's adult children, there is, as was the case with the element of damages for loss of society, ample evidence in the record that would justify a significant award in favor of the surviving spouse, Anomi Urseth, and against the Defendant for her mental anguish occasioned by the loss of her husband. Mr. Urseth's death was totally unnecessary, the result of reckless, negligent and illegal conduct by police officers sworn by law to protect, rather than to take life. One death is simply not like another death insofar as its effect upon survivors is concerned. The manner and the means by which a loved one met his death can have a direct bearing on the amount of grief and anguish occasioned by that demise. A death from natural causes, following a protracted illness of a terminal nature, while devastating to a surviving spouse, is more easily understood and, accordingly, accepted than a violent death, brought about by misconduct on the part of those persons who are deemed by society to be the least likely to perpetrate such an incident. In addition, the constant reminder of the manner and means by

---

**11.** While cases in which future earnings are adjusted for present value are legion, this Court has been unable to discover any cases in which damages for loss of society and/or for mental anguish have been so adjusted, presumably because these elements of damages lack the basic premise implicit in damages for loss of future earnings, to wit: a *steady* stream of income (the loss of which forms the basis for this element of damages) projected over a certain stated period of time.

which the death was brought about in the news media, for many months if not years following the death of the loved one, cannot help but add to the anguish felt by the surviving spouse, at least in the early years following the death before news media attention wanes. One can more readily accept a death from disease or an automobile accident, when one is able to bury the deceased and then go on with life, than one can accept a violent death of a loved one, when the death is brought about by sixteen shots at point-blank range from the service revolvers of law enforcement officials who illegally entered the premises where the shooting took place under the pseudo-authority of an illegal, invalid search warrant, particularly when it becomes impossible to "bury the dead" because the mental image of the last seconds of the loved one's life are constantly being re-played by the news media.

The foregoing is not mere speculation by the undersigned; rather, the foregoing facts are both inferences and evidence well supported by the testimony at trial.

Accordingly, this Court concludes, there being ample evidence in the record concerning the mental anguish suffered by Anomi Urseth as the result of the death of her husband at the hands of the Defendant's police officers, that the maximum amount that the jury could have reasonably found on the issue of mental anguish is the sum of $600,000. This figure, unadjusted for present value, represents *approximately* $20,000 per year for each year of Mr. Urseth's remaining life expectancy.[12]

## G. THIS COURT'S JUDGMENT ENTRY OF AUGUST 4, 1986 (DOC. # 200) IS AMENDED TO REFLECT THE FACT THAT COSTS, RATHER THAN BEING THE SOLE RESPONSIBILITY OF THE DEFENDANT, ARE TO BE SPLIT BETWEEN THE PARTIES

Defendant seeks to have this Court alter its Judgment Entry of August 4, 1986 (Doc.

# 200) which assessed costs to the Defendant, contending that the Defendant was the prevailing party in the federal civil rights action and, since that is the only claim under which the Plaintiff prevailed, only those costs properly recoverable under the state law claim can be assessed against it. Defendant's contention is well taken.

A trial court seemingly has great discretion in the manner of the allocation of court costs. *W.R. Grace & Co. v. Hargadine*, 392 F.2d 9, 20 (6th Cir.1968) (Where no party to litigation prevailed completely, "costs ... rest largely in the discretion of the district judge."); *Steel Constr. Co. v. Louisiana Highway Comm'n*, 60 F.Supp. 183, 193 (E.D.La.1945) (Where nine-tenths of the record related to matters on which Plaintiff was unsuccessful, costs would be apportioned on basis of 90 percent against Plaintiff and 10 percent against Defendant.); *Bridges v. Sheldon*, 7 F. 17, 19 (C.C. D.Vt., 1880) ("Both parties having prevailed and failed to some extent, upon the items disputed and litigated, the costs will be apportioned according to the relative importance of the items in dispute won and lost by the respective parties, and the time and expense spent upon each."); *see also Adams v. Howard*, 19 F. 317 (C.C.S.D.N.Y. 1884). Because of the sheer impossibility of determining exactly which costs incurred in this protracted litigation were attributable to the state law claim on which Plaintiff prevailed, as opposed to the federal civil rights claim on which Defendant prevailed, this Court will order that the Court costs be allocated on the basis of 50 percent against Plaintiff and 50 percent against Defendant—a 50–50 split of properly assessed costs.[13]

## H. SUMMATION

Based upon the evidence in this case, the maximum amount that the jury reasonably

---

**12.** See *supra* n. 11.

**13.** The Defendant states that Plaintiff should be entitled "to costs under the state claim and pursuant to state rules." Defendant City of Dayton's Motion for New Trial or, Alternatively Remittitur (Doc. # 208, at 9–10). However, the

assessment of costs and the matter of which items are taxable as costs, even with state claims tried in federal courts, is a matter of federal rather than state law. Fed.R.Civ.P. 54(d); 28 U.S.C. § 1920.

could have returned is $1,650,000, computed as follows:

1. Loss of economic support (earning capacity, loss of services and loss of prospective inheritance) .. $ 750,000

2. Loss of non-economic support

   a) Loss of society ......... $300,000

   b) Mental anguish ......... 600,000    900,000
                               $1,650,000

## I. CONCLUSION

Having ruled upon the sole remaining issue involved in this litigation, barring the Plaintiff's refusal of the remittitur and a new trial on the issue of damages resulting therefrom the *Urseth* case will not take leave of this trial court, to ascend, no doubt, to the rarified air of the Sixth Circuit Court of Appeals. Regardless of what transpires in that court, this trial judge is done with any and all aspects of this case for all time to come. That being so, it occurs to the undersigned that this is a propitious time for a comment or two upon the jury verdict on the subject matter of this trial.

The jury has decided that James Urseth did not have to die, that his death was totally and wholly unnecessary to any legitimate police function and activity. The evidence in this case clearly showed *both* a pattern of illegality engaged in by the Organized Crime Unit of the Dayton Police Department, as exemplified by the illegal and fraudulently obtained search warrant employed to gain entrance into the residence in which James Urseth was shot, *and* a picture of that vital unit of the police department being totally out of control as a result of a lack of direction and supervision from the unit's and the department's command structure. It is time that the City and its police department decide whether a lesson has been learned from the jury verdict in the *Urseth* case. It is time for one and all to realize that if this man is not to have died in vain, the City and its police department must give some assurance to the citizens of this community that such a death is not likely ever to occur again under the same or similar circumstances.

Police officers have what is, at best, a thankless task, daily putting their lives on the line to protect each and every one of us against those who would disturb the peace and tranquility of this community. Police officers, as a group, are as honorable as, if not more so than, any other group of citizens (judges and attorneys included). It is indeed a shame that the actions of a few should have spoiled the reputations of the many.

Defendants' counsel, in his concluding argument to the jury, likened the situation which police officers face on a daily basis to a "war"—a war between the good citizens of this community and those who would destroy it with drugs and criminal activity. Few would disagree with this characterization of the police officers' daily lot, but no matter how vicious the "war", no matter what the odds seem to be, the ends to be achieved must *never, ever,* be allowed to justify the means. Conduct such as exhibited by the police in this case simply cannot be tolerated in this or in any other community. The public has the right to expect and to demand effective and aggressive law enforcement conducted within a constitutional and a legal framework. A constitutional democracy such as ours mandates that such a "war" must not be fought at the expense of the rights and the safety of the public. Indeed, when the public perceives that it has just cause to fear the police officer sworn to protect the public, as much as, if not more than, the criminal, himself, respect for law and order diminishes almost to the point of no return.

The City has defended its police officers and has lost that defense at the hands of the jury. Regardless of what may be the eventual outcome of this case in the appellate court, the facts leading to the untimely and unnecessary death of James Urseth will remain unchanged. The City and its police department must, through positive statements and actions, above and beyond the convening of "blue ribbon commissions", changing the organizational structure of the police department, altering the manner in which promotions to command positions are determined, and promising to

study the Lopez report, assure the members of the public that this "war" against the criminal element will continue to be fought vigorously and yet within a legal and constitutional framework. To do otherwise will be to risk another James Urseth case, another tragedy which will, while proclaiming loud and clear that the community has learned nothing from the death of James Urseth, serve as proof positive that he died needlessly and in vain, a result which will further diminish respect for the police and law enforcement in this community to a level below which it will not soon, if ever, recover.

WHEREFORE, based upon the aforesaid, the Court having concluded that $1,650,000 is the maximum amount that the jury reasonably could have returned based upon the evidence in this case, the Defendant's Motion for a New Trial or, Alternatively, Remittitur is sustained and a new trial on the limited issue of damages will be granted unless, within twenty (20) days from date of this decision and entry, Plaintiff agrees to accept a remittitur to the sum of $1,650,000.

This filing is *not* meant to constitute a final judgment entry.