Faith PESCATORE, as personal representative and administratrix of the Goods, Chattels and Credits of Michael C. Pescatore, deceased, Plaintiff–Appellee,

v.

PAN AMERICAN WORLD AIRWAYS, INC., Pan Am World Services, Inc., and Alert Management Systems, Inc., Defendants–Appellants.

No. 928, Docket 95–7637.

United States Court of Appeals, Second Circuit.

Argued March 4, 1996.

Decided Sept. 9, 1996.

David M. Schuller, New York City (Aaron J. Broder, Meryl I. Schwartz, Steven M. Nathan, Adam Polo, Bailey & Broder, New York City, on the brief), for Plaintiff–Appellee.

Richard M. Sharp, Washington, DC (Frederick C. Schafrick, Valerie E. Ross, J. Bradford Wiegmann, Shea & Gardner, Washington, DC, Keith D. Dunnigan, Bai, Pollock & Dunnigan, Bridgeport, CT, on the brief), for Defendants–Appellants.

Before MINER, JACOBS and CABRANES, Circuit Judges.

JACOBS, Circuit Judge:

On December 21, 1988, a bomb in a suitcase aboard Pan Am flight 103 exploded, causing the aircraft to crash at Lockerbie, Scotland. All 243 passengers and 16 crew members died. Many of the decedents' survivors brought wrongful death actions under Article 17 of the Warsaw Convention against Pan American World Airways and two affiliated corporations, Pan Am World Services and Alert Management Systems (collectively, "Pan Am"). *See* Convention for Unification of Certain Rules Relating to International

Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, *reprinted at* 49 U.S.C. § 40105 note (hereinafter, the "Warsaw Convention"). These cases (including plaintiff Faith Pescatore's case) were consolidated in the Eastern District of New York.[1] Although recovery under the Warsaw Convention is generally limited to $75,000 per passenger, that limitation does not apply if death or injury occurs as a result of a carrier's "wilful misconduct." *Id.* art. 25(1). In a bifurcated, thirteen-week jury trial on the issue of liability, the plaintiffs succeeded in establishing that the deaths of the passengers and crew aboard Pan Am flight 103 were proximately caused by Pan Am's wilful misconduct.

The district court initially anticipated that the jury that had rendered the liability verdict would consecutively hear the damage cases arising from the Lockerbie disaster. However, after conducting three prolonged damages trials before the same jury, the district court granted Pan Am leave to appeal (i) the court's decision to permit recovery for loss of society and (ii) the liability verdict. We affirmed both the ruling on loss of society in two of the cases, vacated the loss of society ruling in one of the cases, and affirmed the liability verdict. *In re Air Disaster at Lockerbie Scot.*, 37 F.3d 804, 829, 830 (2d Cir.1994) ("*Lockerbie II* "), *cert. denied*, —— U.S. ——, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995). Familiarity with that opinion is assumed. Of critical importance to this appeal, we held that "damages in a Warsaw Convention case are governed by federal common law principles," and that the compensability of damages for loss of society and companionship is determined "by an examination of maritime law." *Id.* at 828.

Faith Pescatore's case then proceeded to trial on the issue of damages.[2] As we had instructed in *Lockerbie II*, compensability of

damages at that trial was determined in accordance with federal maritime law. Pescatore sought damages for loss of society, loss of services and loss of financial contribution resulting from the death of her husband, Michael C. Pescatore, plus prejudgment interest. Pan Am appeals from a $19,059,040 judgment entered in favor of Pescatore after a twelve-day jury trial in the United States District Court for the Eastern District of New York (Platt, *J.*), and an order entered May 26, 1995, denying Pan Am's motion for a new trial.

Prior to oral argument in this appeal, the Supreme Court decided *Zicherman v. Korean Air Lines Co.*, —— U.S. ——, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). Briefly stated, *Zicherman* holds that the Warsaw Convention leaves it to adjudicating courts to specify what harms are cognizable, and that the "particular law of the United States [that] provides the governing rule" with respect to damages is "the law that would govern in absence of the Warsaw Convention." *Id.* at ——, 116 S.Ct. at 636. The Court specifically disapproved of this Circuit's determination (in our opinion in *Zicherman*, 43 F.3d 18, 21–22 (2d Cir.1994)) that Warsaw Convention cases are uniformly governed by general maritime law, and instead held that the Warsaw Convention "leave[s] the specification of what harm is legally cognizable to the domestic law applicable under the forum's choice-of-law rules." *Id.* at ——, 116 S.Ct. at 637. In *Zicherman*, because the disaster occurred over the Sea of Japan, the damages issues were governed by the Death on the High Seas Act, 46 U.S.C. app. §§ 761–768 ("DOHSA").

In this case, the disaster occurred over Scotland. No federal statute governs the compensability of damages caused by air disasters that occur over foreign lands. The

1. Prior to trial, the district court granted partial summary judgment for Pan Am dismissing the plaintiffs' punitive damages claims. *In re Air Disaster in Lockerbie, Scot.*, 733 F.Supp. 547, 554 (E.D.N.Y.1990). The district court certified the issue for immediate appeal to this Court, 736 F.Supp. 18, 21 (E.D.N.Y.1990), and we affirmed. *In re Air Disaster at Lockerbie, Scot.*, 928 F.2d 1267, 1282 (2d Cir.) ("*Lockerbie I* "), *cert. denied*, 502 U.S. 920, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991).

2. The claims of at least two other plaintiffs have also proceeded to the damages phase in jury trials in the Eastern District, *Bisset v. Pan American World Airways*, 89 CV 1460 (E.D.N.Y.Seybert, *J.*), and *Caffarone v. Pan American World Airways*, 89 CV 2569 (E.D.N.Y., Manuel L. Real, *J.*, sitting by designation).

question that we therefore must answer is which sovereign's law would govern the issue of the plaintiff's damages in such a case "in [the] absence of the Warsaw Convention." *In re Air Disaster at Lockerbie, Scot.*, 928 F.2d 1267, 1282 (2d Cir.) ("*Lockerbie I*"), *cert. denied*, 502 U.S. 920, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991), and *Lockerbie II* hold that federal common law—as set forth in federal maritime law—furnishes special rules governing damages. Pan Am argues that we must alter the law of the case because of the Supreme Court's holding in *Zicherman* that the Warsaw Convention does not "*empower us to develop some common-law rule*—under cover of general admiralty law or otherwise—that will supersede the normal federal disposition." *Zicherman*, —— U.S. at ——, 116 S.Ct. at 636 (emphasis added).

We agree that *Zicherman* embodies an intervening change in controlling law that requires us to alter the law of this case.[3] The normal federal disposition is for a federal court to apply the relevant state's law as the federal rule of decision absent a "significant conflict between some federal policy or interest and the use of state law." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, ——, 114 S.Ct. 2048, 2055, 129 L.Ed.2d 67 (1994) (internal quotation marks and citation omitted). For reasons addressed in this opinion, no such conflict is asserted here. We therefore hold that the law that governs damages in this case must be determined in accordance with the choice of law rules of the forum jurisdiction. *See Zicherman*, —— U.S. at ——, 116 S.Ct. at 635. We further conclude that, under choice of law rules applied by New York and by the federal courts in federal question cases, the applicable body of substantive law governing damages is the law of Ohio (the plaintiff's domicile and residence), not federal maritime law.

At trial, the plaintiff recovered damages for loss of society and loss of financial support. Ohio law permits recovery for such loss. Pan Am argues, however, that a new trial is required because Ohio permits the introduction of evidence of a plaintiff's plans

to remarry, and because Pan Am was prohibited from introducing such evidence. Because we find no authority for Pan Am's argument that Ohio law requires the introduction of plans to remarry, we reject Pan Am's claim that a new trial is necessary. We agree, however, with Pan Am's contention that the district court abused its discretion in making and allowing reference to the liability jury's finding of wilful misconduct, but we hold that that error is insufficient to warrant a new trial. We reject Pan Am's argument that the jury awards of $5 million for loss of society and $9 million for loss of financial support are excessive under Ohio law, and therefore affirm both awards. Finally, we remand to the district court for a determination as to whether the plaintiff is entitled to prejudgment interest under Ohio law.

## BACKGROUND

Michael C. Pescatore, a 33 year-old vice-president of British Petroleum Chemicals of America (a subsidiary of British Petroleum, or "BP") was killed in the Lockerbie disaster while en route to the United States from his post in London. Michael Pescatore had excelled in a succession of challenging managerial positions, and was being groomed, at the time of his death, for one of the very top positions at BP.

Plaintiff Faith Pescatore, his wife, was one of the plaintiffs who established Pan Am's liability for wilful misconduct. She sought damages from Pan Am for (i) loss of past and future financial contributions, (ii) loss of past and future services, (iii) loss of society, and (iv) prejudgment interest on the verdict.

Then–Chief Judge Platt made two significant rulings on issues common to all future damage trials. First, in an unpublished pretrial order dated March 28, 1995, the district court denied Pan Am's motion *in limine* to exclude, among other things, reference at trial to the finding of wilful misconduct made by the liability jury. The district court reasoned that the damages "jury must be fully informed as to why damages are not limited to $75,000 [by the Warsaw Convention] in

---

**3.** This opinion was circulated to all active members of this Court prior to filing, and none of them has objected to its filing.

this trial." Second, in an order dated April 3, 1995, the district court denied Pan Am's motion for an order in all pending damages cases (including this one) to strike the plaintiffs' claims for loss of society. In making that ruling, the district court relied on *Lockerbie II*, 37 F.3d at 829–30, and this Court's decision in *Zicherman v. Korean Air Lines Co.*, 43 F.3d 18, 21–22 (2d Cir.1994), both of which held that damages for loss of society are recoverable under federal maritime law.

The damages issues were tried to a jury from April 3 to April 17, 1995. The plaintiff offered the testimony of several of Michael Pescatore's colleagues, including four senior officers of BP, to prove loss of past and future financial contributions. Each of these witnesses described the decedent's past career successes and his potential for future success. The plaintiff also offered the expert testimony of Dr. Edward Glaeser, a labor economist, who estimated the plaintiff's lost financial support at from $25.5 million to $73.8 million in 1988 dollars. Pan Am's own expert witness valued the loss of the decedent's financial support at approximately $2.398 million. The plaintiff testified as to loss of society and loss of services.

On April 17, 1995, the jury returned a special verdict for the plaintiff in a total amount (including interest) of $19,059,040. That award consisted of (i) $9,000,000 for loss of past and future financial services; (ii) $14,000 for loss of past and future services; (iii) $5,000,000 for loss of "society, companionship, love and affection[,] past and future," and (iv) $5,045,040 in net prejudgment interest.

Pan Am moved the district court for a new damages trial on the ground that the loss of society and loss of support awards were excessive. That motion was denied in a memorandum and order entered on May 26, 1995. 887 F.Supp. 71, 74 (E.D.N.Y.1995). On June 23, 1995, Pan Am filed a timely notice of appeal to this Court. On July 25, 1995, the district court, acting *sua sponte*, issued an opinion further explaining its decision to admit evidence that Pan Am had been found liable for wilful misconduct by the liability jury.

## DISCUSSION

On appeal, Pan Am contends that a new trial on damages is justified for several reasons. Primarily, Pan Am contends that *Zicherman v. Korean Air Lines Co.*, —— U.S. ——, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996), alters the law of this case. According to Pan Am, *Zicherman* mandates that in Warsaw Convention cases (such as this one) the substantive law governing the issue of damages must be determined according to ordinary choice of law principles. Pan Am argues that, under New York's choice of law principles, the law of Ohio governs the compensability of the plaintiff's damages. According to Pan Am, Ohio law permits evidence of a plaintiff's plans to remarry to be introduced in wrongful death actions. Because Pan Am was precluded from developing or introducing such evidence, Pan Am argues that a new trial is warranted.

Second, Pan Am contends that the district court erred in permitting and making reference to the liability jury's finding that Pan Am was liable for "wilful misconduct," and by permitting plaintiff's counsel to argue that the jury should award "blood money" to the plaintiff. Pan Am argues that these remarks were prejudicial to Pan Am, and therefore warrant a new trial. Third, Pan Am contends that under Ohio law the awards for loss of society and loss of financial support are excessive, and the award for prejudgment interest was made without the proper evidentiary hearing. We separately address each of Pan Am's arguments.

### I. *Choice of Law.*

There is no doubt that the controlling law of this case, as expressed in *Lockerbie I* and *Lockerbie II*, has been affected by the Supreme Court's recent decision in *Zicherman.* Accordingly, we must first identify the law of this case that governs the precise issue challenged here—*i.e.*, the source of substantive law governing damages in Warsaw Convention cases. We then must determine whether *Zicherman* embodies such "an intervening change of controlling law" as would justify departure from the law of this case. *Doe v. New York City Dep't of Social Servs.*, 709

F.2d 782, 789 (2d Cir.) (internal quotation marks and citation omitted), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *see Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993) (rule of federal law announced by Supreme Court "must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule"). If so, we must determine which sovereign's law furnishes the law of damages, and ascertain whether a new trial on damages under that law is necessary.

### A. The Law of This Case.

In our first decision arising out of this litigation, *Lockerbie I,* we considered "whether a plaintiff may state a claim for punitive damages in a wrongful death action governed by the Warsaw Convention, assuming the carrier committed willful misconduct." 928 F.2d at 1269–70. Because the Warsaw Convention's "goals of uniformity and certainty are frustrated by the availability" of causes of action created by state law, we "deduce[d] the Convention preempts state law causes of action." *Id.* at 1275.

We then "determine[d] what law must be applied in deciding the claims before us." *Id.* at 1278. Because "[t]he source of the right to sue under the Convention is the Convention itself—a treaty that only the federal government has the power to make," we held that "the source of the right is federal law." *Id.* Of critical importance to this appeal, we recognized that "[t]wo choices are generally available to a court in deciding the law created by a federal cause of action: adopting state law or creating a uniform federal common law." *Id.* Because "[i]t would make little sense to adopt state law when uniform interpretation of the federal law is more consistent with the Convention's purposes," *id.,* we adopted "substantive federal common law." *Id.* at 1279. Under federal common law (as embodied in federal maritime law), punitive damages are unavail-

able as a form of compensatory relief. *Id.* at 1279–80. Because we also found that the drafters of the Warsaw Convention did not envision a cause of action to punish a defendant or to deter others, we concluded that a plaintiff in a Warsaw Convention case could not recover punitive damages. *See id.* at 1280–88.

We faced a similar question in *Lockerbie II,* which required us to determine, among other things, whether loss of society and companionship damages are recoverable under the Warsaw Convention.[4] Referring to our decision in *Lockerbie I,* we again determined that the applicable body of substantive law was furnished by federal common law. *Lockerbie II,* 37 F.3d at 828. Specifically, we looked to federal maritime law, "which is probably the oldest body of federal common law," to resolve the question. *Id.*

Finding a conflict of authority between statutory and common maritime law, we turned then to the history and text of the Warsaw Convention in order "to determine which of the maritime rules—statutory or general—is most consistent with the language used and the intent of the parties to the treaty." *Id.* at 829. The original text of the Warsaw Convention permitted compensation for "dommage survenu," a term which we translated as "damage sustained." *Id.* (citing Warsaw Convention, art. 17). Because "[w]e encountered no understanding in French law that might support limiting 'dommage survenu' to exclude loss of society awards," we held that the proper substantive law was furnished by general maritime law. *Id.* In accordance with federal maritime law, we concluded that loss of society damages were available in Warsaw Convention cases to the spouses and dependents of decedents. *Id.* at 829–30

### B. The Law of the Case Doctrine.

The law of the case doctrine " 'posits that when a court decides upon a rule of law, that decision should continue to govern

---

4. The appellants in *Lockerbie II* agreed that maritime law furnished the proper substantive law, but contended that we should "look only to maritime cases brought under [DOHSA], and the

Jones Act, 46 U.S.C.App. § 688, which preclude recovery for loss of society damages." *Lockerbie II,* 37 F.3d at 828–29.

the same issues in subsequent stages in the same case.' " *DiLaura v. Power Auth.*, 982 F.2d 73, 76 (2d Cir.1992) (quoting *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir.1991)); *see also NLRB v. Coca–Cola Bottling Co.*, 55 F.3d 74, 77–78 (2d Cir.1995). The doctrine is "admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Virgin Atlantic Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.), *cert. denied*, 506 U.S. 820, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992); *see also Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) (law of case doctrine "does not limit the tribunal's power"). "We have repeatedly stated we will not depart from [the law of the case] absent 'cogent' or 'compelling' reasons." *Doe*, 709 F.2d at 789 (citing cases). One ground that justifies reconsideration of the law of the case is " 'an intervening change of controlling law.' " *Id.* (quoting 18 Charles A. Wright *et. al., Federal Practice and Procedure* § 4478, at 790 (1981)); *see also DiLaura*, 982 F.2d at 76 (same); *Virgin Atlantic*, 956 F.2d at 1255 (same).

We now consider whether the Supreme Court's decision in *Zicherman* embodies an intervening change of controlling law that might alter the law of this case as expressed in *Lockerbie I* and *Lockerbie II*.

### C. *Zicherman*.

In 1983, Korean Air Lines ("KAL") flight KE007 was shot down by the Soviet Union when it strayed into Soviet airspace over the Sea of Japan. *Zicherman* was an appeal arising out of litigation brought against KAL by relatives of those who died on flight KE007. *See Zicherman v. Korean Air Lines Co.*, 43 F.3d 18, 20 (2d Cir.1994). We were required to determine whether federal maritime law precluded the plaintiffs' recovery

for loss of society and for grief. *Id.* In accordance with our decisions in *Lockerbie I* and *Lockerbie II*, we held that "a uniform law should govern Warsaw Convention cases." *Id.* at 21 (citing *Lockerbie I*, 928 F.2d at 1278–79). Accordingly, "[i]n order to maintain a uniform law under the Warsaw Convention, we [found] general maritime law, rather than DOHSA, more appropriate" to the issue of damages. *Id.* at 22.

The Supreme Court reversed that portion of our decision. *Zicherman v. Korean Air Lines Co.*, — U.S. —, — – —, 116 S.Ct. 629, 632–37, 133 L.Ed.2d 596 (1996). The Court first focused (as we did in *Lockerbie II*, 37 F.3d at 829) on the meaning of "dommage survenu" in the original text of the Warsaw Convention. The Court rejected the petitioner's argument that the Convention created a cause of action for "what French law, in 1929, recognized as *legally cognizable* harm." *Id.* at —, 116 S.Ct. at 632. Instead, the Court held that " '*dommage*' means (as it does in French legal usage) 'legally cognizable harm,' but that Article 17 leaves it to adjudicating courts to specify what harm is cognizable." *Id.* at —, 116 S.Ct. at 633. Accordingly, the Court held that "the law of the Convention does not affect the substantive questions of who may bring suit and what they may be compensated for. Those questions are to be answered by the domestic law selected by the courts of the contracting states."[5] *Id.* at —, 116 S.Ct. at 634.

The Court next considered the issue most critical to this appeal. Having concluded that domestic law determines compensable harm, the Court stated that

the next question to which we would logically turn is that of *which sovereign's* domestic law.... *Choice of law is, of course, determined by the forum jurisdic-*

---

5. The drafting history of the Warsaw Convention made clear to the Court that the Convention leaves the questions of "who may recover, and what compensatory damages they may receive ... to 'private international law'—*i.e.*, to the *area of jurisprudence we call 'conflict of laws,'* dealing with the application of varying domestic laws to disputes that have an interstate or international component." *Id.* at —, 116 S.Ct. at 634 (emphasis added) (citing Report of the Third Session

by Henry de Vos, Comité International Technique d'Experts Juridiques Aériens ("CITEJA") Reporter (May 15, 1928), *reprinted in* International Technical Committee of Legal Experts on Air Questions 106 (May 1928); Report of the Third Session of CITEJA by Henry de Vos (Sept. 25, 1928), *reprinted in* Second International Conference on Private Aeronautical Law Minutes, Warsaw 1929, at 255 (R. Horner & D. Legrez trans.1975)).

*tion and would normally be a question confronting us here.* We have been spared that inquiry, however, because both parties agree that ... the issue of compensable harm ... is governed ... by the law of the United States.

*Id.* at ——, 116 S.Ct. at 635 (citation omitted and second emphasis added). Because the accident in *Zicherman* occurred over the high seas, the applicability of DOHSA obviated further inquiry along those lines. *Id.* at ——, 116 S.Ct. at 636–37. But since the Lockerbie disaster occurred over land, DOHSA does not apply, and there is no other applicable federal statute furnishing a rule with respect to damages.

**D.** *Whether Zicherman Alters the Law of This Case.*

■ As summarized above, the law of this case is that federal policy favors uniform application of law in all cases arising under the Warsaw Convention, and that that policy precludes application of state law principles to the compensability of damages. *See Lockerbie II*, 37 F.3d at 828; *Lockerbie I*, 928 F.2d at 1278–79. We believe that the Supreme Court's decision in *Zicherman* embodies an intervening change in controlling law because it requires application of ordinary choice of law principles to determine the proper substantive law governing damages, and because it expressly rejects our prior holding that the Warsaw Convention requires creation of a uniform rule governing damages.

**1.** *The Convention Does Not Authorize Federal Common Law.*

■ The Supreme Court has now held that the Warsaw Convention provides no independent authority for the imposition of a special federal rule: "[T]he Convention itself contains no rule of law governing the present question; nor does it empower us to develop some common-law rule—under cover of general admiralty law or otherwise—that will supersede the *normal federal disposition*." *Zicherman*, —— U.S. at ——, 116 S.Ct. at 636 (emphasis added). The "normal federal disposition," where (as is the case here) no substantive federal provision is relevant to the legal issue at hand, is for "federal courts [to] *incorporate state law* as the federal rule of decision." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98, 111 S.Ct. 1711, 1717, 114 L.Ed.2d 152 (1991) (quoting *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979)) (emphasis added and alterations omitted).

The Supreme Court explained its holding by reference to the text, history and purpose of the Warsaw Convention. According to *Zicherman*, "questions of who may recover, and what compensatory damages they may receive," are resolved not by the Warsaw Convention, but by domestic law. —— U.S. at ——, 116 S.Ct. at 635. "[W]hich sovereign's domestic law" is determined by the choice of law principles of the forum jurisdiction. *Id.* (emphasis omitted) Other signatories to the Convention have "display[ed] the same understanding that the damages recoverable—so long as they consist of compensation for harm incurred ('dommage survenu')—are to be determined by domestic law." *Id.* (emphasis omitted). Some countries, such as England, Germany and the Netherlands, have adopted their own legislation to govern the types of damages recoverable under the Convention. But Congress has not. "Absent such legislation ... Articles 17 and 24(2) provide nothing more than a *pass-through*, authorizing us to apply the law that would govern in absence of the Warsaw Convention." *Id.* at ——, 116 S.Ct. at 636 (emphasis added); *see also Brink's Limited v. South African Airways*, 93 F.3d 1022, 1029 (2d Cir.1996) ("refrain[ing] from fashioning a federal common law rule" to determine what constitutes wilful misconduct under Warsaw Convention). Thus, the question is what law furnishes the federal rule of damages in the absence of the Warsaw Convention.

**2.** *No "Significant Conflict" Has Been Posited.*

Because the Convention provides only a "pass-through," and does not expressly authorize creation of uniform standards for damages, the imposition of federal common law is unwarranted absent a "significant conflict between some federal policy or interest

and the use of state law." *O'Melveny,* 512 U.S. at ——, 114 S.Ct. at 2055 (internal quotation marks and citation omitted).[6] No one has posited a significant conflict that would justify creation of a special common law rule in this case.

■ As we recognized in *Lockerbie I,* in the absence of any federal statute a federal court may "adopt[ ] state law or creat[e] a uniform federal common law," 928 F.2d at 1278, in order to give content to a federal cause of action. *See, e.g., Clearfield Trust Co. v. United States,* 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943). "Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law." *Kimbell Foods, Inc.,* 440 U.S. at 728, 99 S.Ct. at 1458 (internal quotation marks and citation omitted).[7] But resort to federal common law to fill the "interstices of our federated legal system" must be warranted by overriding and compelling federal concerns. *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.,* 62 F.3d 1454, 1459 (D.C.Cir.1995) (D.Ginsburg, *J.*). "Such cases are . . . 'few and restricted,'

limited to situations where there is a 'significant conflict between some federal policy or interest and the use of state law.' " *O'Melveny,* 512 U.S. at ——, 114 S.Ct. at 2055 (citation omitted) (quoting *Wheeldin v. Wheeler,* 373 U.S. 647, 651, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963) and *Wallis v. Pan Am. Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966), respectively); *see also Kamen,* 500 U.S. at 98, 111 S.Ct. at 1717.

In *O'Melveny,* the FDIC contended that, in a cause of action arising under state law and asserted by the FDIC in its role as a receiver, federal common law furnishes substantive principles governing the imputation of knowledge of corporate officers to the corporation and, more specifically, to the FDIC as receiver of the corporation. 512 U.S. at ——, 114 S.Ct. at 2052. The Court began from the default principle that "[t]here is no federal general common law." *Id.* at ——, 114 S.Ct. at 2053 (quoting *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938)). The Court recognized, however, that a special federal rule of decision is warranted where there is a "significant conflict between some federal policy or interest and the use of state law."[8] *Id.* at

6. *Lockerbie I* was decided on March 22, 1991, and applied federal common law to determine whether punitive damages were compensable. 928 F.2d at 1278–80. *O'Melveny* was decided on June 13, 1994, and *Lockerbie II* on September 12, 1994. *O'Melveny* was thus available to the panel in *Lockerbie II,* but *O'Melveny* alone did not dictate an abandonment of *Lockerbie I* 's holding that uniformity justifies imposition of federal common law. The Supreme Court's decision in *Zicherman* reinforces *O'Melveny,* and focuses its impact on *Lockerbie II* by holding that the Convention did *not* "authorize[ ] national courts to pursue uniformity in derogation of otherwise applicable law." *Zicherman,* —— U.S. at ——, 116 S.Ct. at 636. We therefore consider *O'Melveny* and *Zicherman* together to express an intervening change in controlling law to the law of this case embodied in *Lockerbie I* and *Lockerbie II.*

7. In *Kimbell Foods,* the Supreme Court set forth factors that courts should consider in determining whether to fashion a special federal rule: (1) whether the issue requires "a nationally uniform body of law"; (2) "whether application of state law would frustrate specific objectives of the federal program[ ]"; and (3) whether "a federal rule would disrupt commercial relationships

predicated on state law." 440 U.S. at 728–29, 99 S.Ct. at 1458–59 (footnotes omitted). As discussed below, *O'Melveny* focuses our inquiry on the second factor.

8. The Court has frequently and repeatedly emphasized that the circumstances justifying the imposition of a common law rule are "few and restricted." *Wheeldin,* 373 U.S. at 651, 83 S.Ct. at 1445; *see also Kamen,* 500 U.S. at 98–99, 111 S.Ct. at 1717–18 (state law, not federal common law, furnishes substantive principles governing derivative action under Fed.R.Civ.P. 23.1); *Boyle v. United Technologies Corp.,* 487 U.S. 500, 504–06, 108 S.Ct. 2510, 2514–15, 101 L.Ed.2d 442 (1988) (procurement of equipment by United States is one of "a few areas, involving uniquely federal interests," that warrant displacement of state law by federal common law (internal quotation marks and citation omitted)); *Kimbell Foods,* 440 U.S. at 728–30, 99 S.Ct. at 1458–59 ("declin[ing] to override intricate state laws of general applicability" regarding the rights of creditors); *Northwest Airlines, Inc. v. Transport Workers Union of Am.,* 451 U.S. 77, 95, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981) (court must be cautious in fashioning federal common law because "the federal lawmaking power is vested in the legislative, not the judicial, branch of gov-

———, 114 S.Ct. at 2055 (internal quotation marks and citation omitted). But the FDIC pointed to no such conflict. Because the legal issues in that case "involve[d] a host of considerations that must be weighed and appraised"—a job best suited to state legislatures—the Court declined to adopt a special federal rule, and reversed the Ninth Circuit decision that did so. *Id.* at ——–——, 114 S.Ct. at 2055–56 (internal quotation marks and citation omitted).[9]

■ In this case, the only "significant conflict" identified by the parties (or apparent from our review of *Lockerbie I* and *Lockerbie II* ) is between the Warsaw Convention's goal of uniformity and the unruliness of applying multiple state laws. As *Zicherman* and *O'Melveny* together make clear, however, this federal concern is insufficient to justify imposition of federal common law. *O'Melveny* discounted the interest in uniformity as the "most generic (and lightly invoked) of alleged federal interests," and held that such a generalized federal interest is alone insufficient:

> Uniformity of law might facilitate the FDIC's nationwide litigation of these suits, eliminating state-by-state research and reducing uncertainty—but if the avoidance of those ordinary consequences qualified as an identifiable federal interest, we would be awash in "federal common-law" rules.

512 U.S. at ——, 114 S.Ct. at 2055. We recognize that the international interest in legal uniformity in the area of air disasters is not merely a "generalized" one. This interest has motivated a series of international treaties and protocols. Nevertheless, in light

of *O'Melveny* and *Zicherman,* we conclude that legal uniformity is *even in this case* an insufficient reason to employ federal common law.

Moreover, *Zicherman* ruled specifically that the Warsaw Convention does not express a compelling interest in uniformity that warrants supplanting bodies of law that are otherwise applicable. The Court recognized that "[u]ndoubtedly it was a primary function of the Warsaw Convention to foster uniformity." *Zicherman,* —— U.S. at ——, 116 S.Ct. at 636. But the Court determined that the law of international air travel "is not an area in which the imposition of uniformity was found feasible. The Convention neither adopted any uniform rule of its own *nor authorized national courts to pursue uniformity in derogation of otherwise applicable law.*" *Id.* (citations omitted and emphasis added). Given the "vast discrepancies among the various domestic laws" that the Warsaw Convention left "untouched," the Court found it "most unlikely" that "the Convention contains an implicit authorization for national courts to create uniformity between over-land and over-sea accidents," as the petitioners in that case had argued and as we had held. *Id.* Although the Warsaw Convention promotes uniformity in the law of nations in important respects, any conflict between that policy and "otherwise applicable law" does not alone justify creating a uniform federal rule to govern damages. *See Brink's,* 93 F.3d at 1029 ("[T]he Supreme Court recently admonished lower courts to refrain from developing federal common law 'under

ernment"); *Wallis,* 384 U.S. at 68–70, 86 S.Ct. at 1304–05 (state law, not federal common law, provides substantive principles for actions arising under Mining Leasing Act of 1920).

**9.** Subsequent decisions of this Circuit and other circuits recognize that *O'Melveny* constricts the ability of a federal court to craft a uniform federal rule. *See, e.g., DiVall Insured Income Fund, Ltd. Partnership v. Boatmen's First Nat'l Bank,* 69 F.3d 1398, 1402 (8th Cir.1995) (*O'Melveny* requires abandonment of common law holder-in-due-course doctrine in favor of state law); *RTC v. Diamond,* 45 F.3d 665, 671 (2d Cir.) (on remand, explaining that prior decision "does not ... write federal common law"; action arose from federal statute that "by its own terms created a

rule of decision"), *cert. denied,* —— U.S. ——, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995); *Beazer East, Inc. v. Mead Corp.,* 34 F.3d 206, 212 (3d Cir. 1994) (declining to consult federal common law "in interpreting or construing a contract's indemnification provisions vis-a-vis CERCLA" (footnote omitted)), *cert. denied,* —— U.S. ——, 115 S.Ct. 1696, 131 L.Ed.2d 559 (1995); *FDIC v. Massingill,* 30 F.3d 601, 604 (5th Cir.1994) (departing from that circuit's precedent in light of *O'Melveny* and declining to adopt federal common law rule); *RTC v. Maplewood Invs.,* 31 F.3d 1276, 1294 (4th Cir.1994) ("In the light of *O'Melveny,* there is a heavy presumption in favor of application of a rule of decision in accordance with Virginia law as opposed to the creation of a federal rule of decision.").

cover' of advancing the goal of uniformity in Warsaw Convention cases.").

We therefore hold that *Zicherman* embodies an intervening change of controlling law that compels us to alter the law of this case. We conclude that the law governing damages is determined by reference to the relevant sovereign's law, not federal common law.

## II. Which Sovereign's Law Governs Damages?

We are thus faced with a choice of law question. Jurisdiction in this case was predicated on the federal question presented under the Convention. *See Benjamins v. British Euro. Airways*, 572 F.2d 913, 919 (2d Cir.1978) (Convention creates federal cause of action), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979). The "forum jurisdiction" is therefore federal court. In cases arising under other federal statutes, we have applied a "federal common law choice of law rule." *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir.1980) (arising under Edge Act), *cert. denied*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *see also Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 121 (2d Cir.1984) (following *Vintero Sales* ). In the absence of Congressional guidance, we have from time to time consulted the Restatement (Second) of Conflict of Laws (1971) in fashioning that federal rule. *See Aaron Ferer*, 731 F.2d at 121. Other circuits have also consulted the Restatement. *See, e.g., Bickel v. Korean Air Lines Co.*, 83 F.3d 127, 131 (6th Cir.1996) (Warsaw Convention case); *In re Lindsay*, 59 F.3d 942, 948 (9th Cir.1995) (bankruptcy proceeding), *cert. denied*, —— U.S. ——, 116 S.Ct. 778, 133 L.Ed.2d 730 (1996); *Edelmann v. Chase Manhattan Bank, N.A.*, 861 F.2d 1291, 1295 (1st Cir.1988) (Edge Act); *Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1003–04 (9th Cir.1987) (Foreign Sovereign Immunities Act ("FSIA")). But in other circumstances, courts have used the choice of law rules of the state in which the court sits instead of a federal common law choice of law rule. *See Barkanic v. General Admin. of Civil Aviation of the People's Republic of China*, 923 F.2d 957, 961 (2d Cir.1991) (ap-plying New York's choice of law principles in action arising under FSIA); *see also Petra Int'l*, 62 F.3d at 1465 (applying District of Columbia's choice of law rules in action arising under Edge Act); *In re Merritt Dredging Co.*, 839 F.2d 203, 206 (4th Cir.) (applying South Carolina's choice of law rules in action arising under federal bankruptcy code), *cert. denied*, 487 U.S. 1236, 108 S.Ct. 2904, 101 L.Ed.2d 936 (1988).

Demonstrably, the law is unsettled when it comes to applying either a federal common law choice of law rule or state choice of law principles in non-diversity cases. Even within this Circuit, the law is not fixed. *Vintero Sales* and *Aaron Ferer* are arguably precedent for applying federal common law principles to federal choice of law questions. But both *Vintero Sales* and *Aaron Ferer* were decided without the benefit of *O'Melveny*, *Kamen* and other federal decisions which limited our power to create federal common law. *See Petra Int'l*, 62 F.3d at 1465 (noting that *Vintero Sales* was decided "without the benefit of some of the Supreme Court's more recent pronouncements upon the limited domain of federal common law"). And *Aaron Ferer* did not require the Court to undertake a critical analysis of what choice of law rules were applicable because "the parties [did] not attempt[ ] to show that the law of any other potentially interested jurisdiction differs from that of New York." 731 F.2d at 121.

Much more recently, in *Barkanic*, we applied state choice of law rules to a case arising under the FSIA because "we believe[d] that applying the forum state's choice of law analysis will help ensure that foreign states are liable 'in the same manner and to the same extent as a private individual under like circumstances.' " 923 F.2d at 961 (quoting FSIA, 28 U.S.C. § 1606). To use a term from *Zicherman*, the FSIA thereby operates as a "pass-through" to state law principles. *See* —— U.S. at ——, 116 S.Ct. at 636. In this case, because the Warsaw Convention functions as a "pass-through, authorizing us to apply the law that would govern in [the] absence of the Warsaw Convention," *id.*, we believe that application of the forum state's choice of law principles rather than the federal common law rule better effectuates the

Convention's overall intent. *See Brink's*, 93 F.3d at 1030 (applying forum state's choice of law rules where jurisdiction was predicated on FSIA and liability governed by Warsaw Convention). We underscore that, in applying New York choice of law principles, we do not necessarily endorse the principles of "interest analysis" adopted in recent decades by its courts; we apply a species of interest analysis here simply because that is the methodology adopted by New York's courts. Nor do we enlist on either side of the decades-old controversy over choice of law doctrine. *See, e.g.,* Lea Brilmayer, *Interest Analysis and the Myth of Legislative Intent,* 78 Mich. L.Rev. 392 (1980); Perry Dane, *Vested Rights, "Vestedness," and Choice of Law,* 96 Yale L.J. 1191 (1987). But we face no dilemma. Regardless of whether we consult the choice of law principles in the Restatement or in New York law, we arrive at the same result: Ohio law governs.

New York's choice of law principles are expressed in *Neumeier v. Kuehner,* 31 N.Y.2d 121, 128, 335 N.Y.S.2d 64, 70, 286 N.E.2d 454, 457–58 (1972). *See Barkanic,* 923 F.2d at 962–63 (applying *Neumeier*'s choice of law principles). Under *Neumeier,* if the injured party and the defendant reside in different jurisdictions and the accident occurred in a third jurisdiction, the law of the place of the accident presumptively applies. 31 N.Y.2d at 128, 335 N.Y.S.2d at 70, 286 N.E.2d at 458. In the instant case, because Faith Pescatore resided in Ohio and Pan Am is headquartered in New York, the law of Scotland would presumptively apply. That presumption may be overcome, however, if "it can be shown that displacing [the law of Scotland] will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants." *Id.*

Pan Am contends that we should disregard Scottish law and instead apply the law of the decedent's and the plaintiff's domicile—Ohio. We agree. First, in a disaster befalling a plane aloft, the place of the crash is often random (or, as here, fixed by a warped mind) and the sovereignty in which the accident occurs has little interest in applying its sub-

stantive law to the case. *See Babcock v. Jackson,* 12 N.Y.2d 473, 482, 240 N.Y.S.2d 743, 750, 191 N.E.2d 279, 284 (1963) (place of accident has little interest where it was a "purely adventitious circumstance that the accident occurred there"); *see also Foster v. United States,* 768 F.2d 1278, 1282 (11th Cir.1985) (disfavoring law of place where air disaster occurred); *In re Air Crash Disaster Near Chicago, Ill.,* 644 F.2d 594, 615 (7th Cir.) (in air disasters, "place of injury is largely fortuitous"), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981).

■ Second, any interest that Scotland may have in application of its laws to this case is minimal. Scotland has a legitimate and strong interest in promoting safe air travel and in preventing future accidents in its skies. *See id.* (place of accident has interest in promoting "air safety"). But that interest is not advanced by the assessment of the loss suffered by this plaintiff. Under New York's choice of law rules, when conflicting rules concern the "allocation of loss rather than the regulation of conduct, 'the locus jurisdiction has at best a minimal interest in determining the right of recovery or the extent of the remedy.'" *Datskow v. Teledyne Continental Motors Aircraft Prods.,* 807 F.Supp. 941, 944 (W.D.N.Y.1992) (quoting *Schultz v. Boy Scouts of Am., Inc.,* 65 N.Y.2d 189, 198, 491 N.Y.S.2d 90, 96, 480 N.E.2d 679, 685 (1985)); *see also Padula v. Lilarn Properties Corp.,* 84 N.Y.2d 519, 521–22, 620 N.Y.S.2d 310, 311–12, 644 N.E.2d 1001, 1002–03 (1994) (summarizing "distinction ... between a choice-of-law analysis involving standards of conduct and one involving the allocation of losses").

Third, the "place of the wrong," for purposes of New York's lex loci delicti rule, "is considered to be the place where the last event necessary to make the actor liable occurred." *Schultz,* 65 N.Y.2d at 195, 491 N.Y.S.2d at 94, 480 N.E.2d at 683. Although the explosion occurred over Scotland, the causative misconduct occurred in Frankfurt (where the bomb eluded Pan Am's X-ray inspection and was placed on Flight 103, *see Lockerbie II,* 37 F.3d at 811–12), or in London (where Pan Am failed to remove or inspect the unaccompanied bag that carried

the bomb, *see id.* at 814). Under these circumstances, where no negligence or misconduct took place in Scotland, and where no damages were incurred in Scotland, there is really no reason at all why the compensability of the plaintiff's damages should be governed by Scottish law.

The choice is therefore between New York law and Ohio law. This choice presents a true conflict, because Ohio permits recovery for loss of society, but New York does not. *Compare* Ohio Rev.Code Ann. § 2125.02(B)(3) (Anderson 1994) *with* N.Y. Est. Powers & Trusts Law § 5–4.3 (McKinney Supp.1996) *and Liff v. Schildkrout*, 49 N.Y.2d 622, 633–34, 427 N.Y.S.2d 746, 749–50, 404 N.E.2d 1288, 1291–92 (1980) (loss of society not recoverable). New York's choice of law principles require application of the law of the forum with the greatest interest in the litigation. *Neumeier*, 31 N.Y.2d at 127, 335 N.Y.S.2d at 69, 286 N.E.2d at 457.

New York has an interest in regulating the extent to which New York-centered corporations may be held liable for excessive or punitive damages—no small concern here. But punitive damages are not at issue in this case because, as decided in *Lockerbie I*, 928 F.2d at 1280–88, they are unavailable in an action arising under the Warsaw Convention. Conversely, Ohio has an important and obvious interest in ensuring that its residents are fully and adequately compensated for tortious harm. *See Datskow*, 807 F.Supp. at 944 (New York had greatest interest in "extent of recovery for the alleged tort" in case where decedents resided in and were en route to New York, plaintiff resided in Pennsylvania, air disaster occurred in North Carolina and defendants resided in California). In addition, an international airline such as Pan Am could expect to carry Ohioans. Other than the fact that New York was the scheduled destination of the flight, there is no evidence that the plaintiff had any contact with New York. *See Schultz*, 65 N.Y.2d at 201–202 & n. 3, 491 N.Y.S.2d at 98 & n. 3, 480 N.E.2d at 687–88 & n. 3 (parties' reasonable expectations of applicable law are relevant to choice of law analysis). Also important, the harm suffered by the plaintiff—loss of society, loss of financial support and loss of

services—*occurred in Ohio*, where the plaintiff and the decedent resided, and where the plaintiff survives. We therefore hold that under New York's choice of law rules, the law of this plaintiff's state governs compensability of damages.

We reach the same conclusion when we apply federal common law conflict of law principles. As noted above, federal courts frequently consult the Restatement (Second) of Conflict of Laws in crafting these principles. Section 145 states that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has *the most significant relationship* to the occurrence and the parties under the principles stated in § 6." Restatement (Second) of Conflict of Laws § 145(1) (1971) (emphasis added). Section 145 also directs the court to consider where the injury occurred, where the conduct creating the injury occurred, and where the parties are domiciled. *Id.* § 145(2). Section 6 adds the following factors:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Id.* § 6.

The "interest analysis" set forth in the Restatement coincides with New York's choice of law rules. For reasons previously stated, few, if any, of the factors listed above militate in favor of compensating this plaintiff's damages under Scottish or New York law. Here, too, it matters that the harms inflicted on the plaintiff (loss of society, loss of financial contribution and loss of services) are harms inflicted on her in Ohio, and that the decedent was also an Ohioan. We there-

fore hold that the law of Ohio furnishes the proper substantive principles for determining the compensability of the plaintiff's damages.

■ The district court, of course, did not apply Ohio law. But that fact does not necessarily require us to order a new trial on damages. Under Ohio law governing actions for wrongful death, compensatory damages are recoverable for loss of society, loss of services, loss of support and prejudgment interest. Ohio Rev. Code Ann. §§ 2125.02(B) & 1343.03(C).[10] However, Pan Am contends that evidence of the plaintiff's plans to remarry is admissible and relevant to the issue of damages under Ohio law. Because the district court prohibited Pan Am from introducing such evidence, Pan Am contends that a new trial is required on the plaintiff's claims for loss of society and loss of financial support.

■ Ohio's wrongful death statute provides that a plaintiff's status is to be determined on the basis of all facts known as of the date of the decedent's death:

(a) The *date of the decedent's death fixes,* subject to division (A)(3)(b)(iii) of this section, the *status of all beneficiaries* of the action for purposes of determining damages suffered by them and the amount of the damages to be awarded....

(b)(i) In determining the amount of damages to be awarded, the jury or court *may consider all factors existing at the time of the decedent's death* that are relevant to a determination of the damages suffered by reason of the wrongful death.

Ohio Rev.Code Ann. § 2125.02(A)(3) (emphasis added). Ohio provides for a limited exception to the general rule that the "date of the decedent's death fixes ... the status of all beneficiaries" for the purpose of determining damages:

Consistent with the Rules of Evidence, any party to an action for wrongful death may present evidence that the surviving spouse

of the decedent *is remarried.* If such evidence is presented, then ... the jury or court may consider that evidence in determining the damages suffered by the surviving spouse by reason of the wrongful death.

*Id.* § 2125.02(A)(3)(b)(iii) (emphasis added).

It is one thing to show that the plaintiff "is remarried"; it is another to say that she *plans* to remarry. Here, there is no claim that the plaintiff was married at the time of trial.[11] We do not decide whether a plaintiff's plans to remarry, or a plaintiff's relationships and liaisons, may bear upon damages for loss of society under Ohio law. But Pan Am points to no Ohio law that would *require* the district court to admit such evidence. *See Pena v. Northeast Ohio Emergency Affiliates,* 108 Ohio App.3d 96, 109, 670 N.E.2d 268, 276 (1995) (explaining and upholding distinction statute draws between remarriage and "act of cohabitating") (unreported), *appeal denied,* 75 Ohio St.3d 1494, 664 N.E.2d 1291 (1996).

Pan Am claims no other prejudice resulting from the application of federal common law principles of damages. We conclude that the circumstances do not warrant a new trial.

### III.   *Claims of Trial Error.*

■ The liability jury found that Pan Am "engaged in wilful misconduct that led to this fatal crash." *Lockerbie II,* 37 F.3d at 811. Prior to the damages phase of the plaintiff's case, Pan Am moved *in limine* to prevent reference to the liability jury's finding of wilful misconduct. The district court denied that motion. On appeal, Pan Am contends that the district court erred in permitting the damages jury to hear references to the wilful misconduct finding. We agree, but conclude that a new trial is unwarranted.

The district court's March 28, 1995, memorandum and order gave the following reasons for denying Pan Am's *in limine* motion:

---

10.   Ohio law also permits recovery for "[l]oss of prospective inheritance to the decedent's heirs," *see* Ohio Rev.Code Ann. § 2125.02(B)(4), and "[t]he mental anguish incurred by the surviving spouse, minor children, parents, or next of kin." *Id.* § 2125.02(B)(5). These last two elements

were not tried in district court, and there is no appellate issue concerning them.

11.   Pan Am submitted evidence to this Court indicating that the plaintiff was granted a marriage certificate five months after the trial ended.

The finding of wilful misconduct on the part of the defendants clearly impacts on the amount of damages to be awarded.... This jury must be fully informed as to why damages are not limited to $75,000 in this trial.

The district court expanded on this decision in its July 25, 1995, post-trial memorandum and order:

If the [*Lockerbie* ] cases had been tried in the manner which originally was agreed upon, with the liability jury trying all of the damage cases, the [same] jury would have known every detail of the defendants' misconduct, which to put it mildly was extensive.

[I]t seemed, and is, only fair that the other damage actions be tried by juries which at least have some knowledge of the original jury's findings.

At the start of the trial, the district court advised the jury that in a "three and a half month liability trial," Pan Am had been found "liable for wilful misconduct which was a proximate cause of the accident." The district court again made reference to the liability verdict in the charge to the jury: "[A]nother jury has found that the defendant[s] Pan Am World Airways and Alert are responsible for wrongful misconduct which was a proximate cause of the death of Michael Pescatore."

Counsel for the plaintiff referred to the liability verdict on several occasions. During his opening statement, counsel stated that the Pescatore's marriage came to a "terrible tragic end as a result of fault, as a result of wilful misconduct." In summation, plaintiff's counsel stated that another jury had found that Pescatore's death was caused by Pan Am's "wilful misconduct." Plaintiff's counsel referred to wilful misconduct on at least two other occasions in his summation. Pan Am's counsel attempted to explain the import of the wilful misconduct verdict in summation, but was interrupted by the district court and instructed not to refer to or otherwise explain the verdict.

Pan Am contends that the wilful misconduct finding is irrelevant to the issues of damages, and that the district court erred in permitting (and making) these references at trial. Pan Am seeks a new trial. If a new trial is unwarranted, Pan Am argues that the district court's decision to permit reference to wilful misconduct should be reversed so that that issue does not arise in future damages trials related to this litigation.

■ This Court reviews a district court's decision to admit evidence for abuse of discretion. *See United States v. Torniero*, 735 F.2d 725, 730 (2d Cir.1984), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 788, 83 L.Ed.2d 782 (1985). Under the Federal Rules of Evidence, evidence is admissible if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401; *see also* Fed.R.Evid. 402. The only issue before the jury in this case was the issue of compensatory damages. Only evidence relevant to that issue should have been admitted. Because compensatory damages are awarded to compensate the plaintiff, and not to punish the defendant, *see* Restatement (Second) of Torts § 903 (1979), evidence showing the extent of the plaintiff's loss is relevant, while evidence characterizing the misconduct of the defendant is not. *See Sanford v. Johns–Manville Sales Corp.*, 923 F.2d 1142, 1146 (5th Cir.1991) (in damages trial, "the gross negligence finding was irrelevant to the task of the [compensatory damages] jury"). Here, Pan Am's liability for wilful misconduct was no longer at issue and thus not relevant.

The district court's stated grounds for telling the jury about the wilful misconduct finding are unsound. It is true that, if the liability jury had decided this plaintiff's damages, it "would have known every detail of the defendants' misconduct." But that knowledge would have been an effect—not an advantage—of a unitary trial. And the jury would then have known (for better or worse) what the misconduct entailed. But after bifurcation, it was not feasible to reprise Pan Am's wrongs (the district court properly barred Pan Am's trial counsel from re-trying or re-arguing the issue); and it was problematical to give the jury the bare news that the explosion was caused by Pan Am's

"wilful misconduct," a highly potent phrase that is not self-defining and invites speculation. Moreover, it became impossible for the court to limit the emotional resonance and exploitation of the phrase once the phrase was used. By way of further explanation, the district court stated that "[t]his jury must be fully informed as to why damages are not limited to $75,000 in this trial." But the Warsaw Convention's limitation on damages is not part of the ordinary citizen's frame of reference, and it is a remote contingency that jurors will limit damages to $75,000 for that reason.

The district court therefore abused its discretion by mentioning wilful misconduct in its charge to the jury and by permitting the plaintiff's counsel to refer, on several occasions, to wilful misconduct. We therefore conclude that the district court erred in its March 28, 1995, decision and order denying Pan Am's motion *in limine* to exclude all reference to the wilful misconduct verdict in any future damages cases.

■ Pan Am, however, cannot show that the district court's error was so clearly prejudicial to the outcome of the trial on damages as to warrant a retrial. *See Hygh v. Jacobs,* 961 F.2d 359, 365 (2d Cir.1992) ("The burden of demonstrating prejudice requiring reversal rests with the party asserting error."). A new trial is warranted only where the introduction of inadmissible evidence is a clear abuse of discretion, and where that abuse of discretion is prejudicial to the ultimate result of trial. *Id.* We will refuse to grant a new trial unless we are " 'convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.' " *Id.* (quoting *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 370 (2d Cir.1988)). Prejudice is measured by assessing the error in light of the record as a whole. *See, e.g. id.* at 365 (erroneous evidentiary determination); *National R.R. Passenger Corp. v. One 25,900 Square Foot Parcel of Land,* 766 F.2d 685, 688 (2d Cir.1985) (erroneous jury instruction); *Selzer v. Fleisher,* 629 F.2d 809, 811 (2d Cir.1980), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981) (erroneous evidentiary determination).

The court mentioned the term "wilful misconduct" at least twice and defense counsel uttered that term at least four times. These references were made over a two-week jury trial, but we think it is impossible that they escaped the jury's notice. However, the plaintiff presented abundant evidence that supports the jury's findings on damages, including numerous documents, testimony by the decedent's colleagues and uncontroverted testimony on loss of society damages by the plaintiff herself. In addition, the expert witnesses for Pan Am conceded that the plaintiff suffered as much as $2 million in lost financial support. Because we are not "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice," a new trial is unwarranted. *Hygh,* 961 F.2d at 365 (internal quotation marks and citation omitted).

■ Pan Am next contends that a new trial is required because plaintiff's counsel made a highly prejudicial remark in rebuttal summation. The remark of plaintiff's counsel, however, must be placed in the context of the trial. In summation, Pan Am's counsel argued that the plaintiff was seeking an inordinate amount in damages relative to her loss. Toward that end, Pan Am's counsel stated: "We are not talking about celebrity or funny money. We are not. But I believe [the plaintiff's expert and counsel] are talking about such money." In rebuttal summation, plaintiff's counsel stated that, contrary to the contentions of Pan Am's counsel, the money that the plaintiff was seeking was "not funny money. It is not funny money. That is *blood money.* That is what comes from the killing of a young man...." (Emphasis added.)

The remark of plaintiff's counsel regarding "blood money" was a slippery tactic that arguably constituted a prejudicial call for the jury to award punitive damages, and risked a mistrial. *See Pappas v. Middle Earth Condominium Ass'n,* 963 F.2d 534, 540 (2d Cir. 1992) ("[W]hen the conduct of counsel in argument causes prejudice[ ] to the opposing party and unfairly influences a jury's verdict, a new trial should be granted."); *see also Minneapolis, St. Paul, & Sault Ste. Marie Ry. Co. v. Moquin,* 283 U.S. 520, 521, 51

S.Ct. 501, 502, 75 L.Ed. 1243 (1931) (setting aside verdict influenced by improper argument). Pan Am, however, made no contemporaneous objection to that remark, and therefore did not afford the trial court an opportunity to deal with it then and there. We ordinarily do not consider claims of error that were not properly raised at trial unless the error is plain. *See United States v. Carson,* 52 F.3d 1173, 1187 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 934, 133 L.Ed.2d 861 (1996). And we have warned that the plain error exception "should only be invoked with extreme caution in the civil context." *Id.* at 1188. Only where an unpreserved "error [is] so serious and flagrant that it goes to the very integrity of the trial" will a new civil trial be warranted. *Brenner v. World Boxing Council,* 675 F.2d 445, 456 (2d Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982) (citation and internal quotation marks omitted, alteration in original). Pan Am has not attempted to make such a showing, and we think such a showing cannot be made.

## IV. *Awards for Damages and Interest.*

■ Pan Am moved for a new trial in district court pursuant to Fed.R.Civ.P. 59 on the ground that the jury awards of $5 million for loss of society and $9 million for loss of support are excessive. The district court denied that motion, and Pan Am appeals. Large as they are, we do not believe that the district court abused its discretion in refusing to reduce or vacate the awards for loss of society and loss of support in light of the evidence.

Pan Am also contends on appeal that the jury's award of $5.045 million in prejudgment interest must be vacated. We agree with that contention because Ohio law permits an award of prejudgment interest only upon a finding concerning good faith efforts to settle. Because the district court made no inquiry into that issue, we remand for further proceedings.

## A. *Loss of Society.*

Pan Am moved for a new trial on the ground, *inter alia,* that the $5 million loss of society award was excessive. To show that the award was excessive, Pan Am pointed to three substantially lesser awards for loss of society in other Lockerbie cases. The district court found that the plaintiff's compelling testimony regarding the strength of her marriage to the decedent was uncontradicted, noted that other courts have upheld multi-million dollar awards for loss of society, and therefore held that the loss of society award was not excessive.

■ In a federal question case, a district court will ordinarily deem an award excessive if it "shock[s] the judicial conscience." *See Matthews v. CTI Container Transp. Int'l Inc.,* 871 F.2d 270, 278 (2d Cir.1989) (internal quotation marks and citation omitted). Because we are holding today that the federal rule for determining damages in this case is furnished by Ohio law, the federal rule for excessiveness should also be furnished by Ohio law. Ohio employs a standard for excessiveness that is generally similar to the federal standard: An Ohio trial court may disturb a jury verdict only where "damages awarded are so high that to permit the award to stand would be a denial of substantial justice," *Felden v. Ashland Chem. Co.,* 91 Ohio App.3d 48, 64, 631 N.E.2d 689, 699 (1993) (citation and internal quotation marks omitted), or where the award is "manifestly against the weight of the evidence." *Toledo, C. & O. R.R. Co. v. Miller,* 108 Ohio St. 388, 388, 140 N.E. 617, 617 (1923). In the federal courts, trial judges render an excessiveness determination in the first instance, *see Gasperini v. Center for Humanities, Inc.,* —— U.S. ——, ——, 116 S.Ct. 2211, 2217, 135 L.Ed.2d 659 (1996), and their decisions are reviewed on appeal only for an abuse of discretion, *see West v. Jutras,* 456 F.2d 1222 (2d Cir.1972); *see also Gasperini,* —— U.S. at ——, 116 S.Ct. at 2225.

On appeal, Pan Am contends that the loss of society award is excessive under any standard, and argues that we should therefore vacate it and order a new trial. According to Pan Am, the highest award upheld by a court in Ohio for loss of society was $300,000. In *Urseth v. City of Dayton,* 680 F.Supp. 1150, 1157 (S.D.Ohio 1987), a jury awarded $2.75 million in damages for loss of society and mental anguish, and the district court re-

duced that award to $300,000 on the (not compelling) idea that the plaintiff-spouse should receive $10,000 per year for each year of the decedent's remaining life-expectancy. The district court in *Urseth* did not cite Ohio authorities in making that determination, and instead applied the federal ("shock the conscience") standard. *See id.* at 1152. Moreover, in *Urseth* part of the loss of society award was for damages suffered by the decedent's children. But in reviewing that part of the award, the district court found that the decedent occupied a "diminishing role with regard to services and society insofar as his children were concerned." *Id.* at 1156. In the instant case, the jury heard the plaintiff testify as to the strength of her marriage. That kind of testimony is not easy to controvert, but the fact remains that it was uncontroverted. Because the circumstances in *Urseth* are substantially different from those in this case, it does not persuade us that the district court in this instant case abused its discretion in denying Pan Am's motion for a new trial.

Pan Am also points to loss of society awards in other Warsaw Convention cases to show that the loss of society award in this case is excessive. Pan Am contends that because the highest award for loss of society in another Warsaw Convention case was $750,000, that amount "is the highest possible award to Faith Pescatore that could be sustained." We are not persuaded. The trial court heard the testimony of the plaintiff, reviewed the evidence and the award, reviewed awards for loss of society upheld by other courts in other wrongful death actions, and concluded that the $5 million award in this case was not excessive. Absent a showing that the award was against the weight of the evidence introduced at trial, or some other indication that Ohio courts would deem excessive a verdict of $5 million for loss of society, we conclude that the district court did not abuse its discretion in denying Pan Am's motion for a new trial.

B. *Loss of Financial Support.*

Pan Am also moved for a new trial pursuant to Fed.R.Civ.P. 59 on the ground that the $9 million award for loss of financial support was excessive. The district court concluded that a sufficient evidentiary basis was presented at trial to support that award, and denied Pan Am's motion. On appeal, Pan Am contends that the district court abused its discretion because the $9 million award was based on speculative projections and unrealistic assumptions, and because the district court treated Pan Am's witnesses less favorably than the plaintiff's witnesses. We disagree.

The plaintiff offered the testimony of four senior officers of British Petroleum to establish Michael Pescatore's employment history and prospects for future financial success. Pescatore was a college graduate with a degree in engineering and applied physics, and an M.B.A. from the University of Chicago. The senior BP executives testified that Pescatore achieved remarkable success in every position that he held, and variously described Pescatore as "well positioned to move up in BP to the very, very high levels," "probably the cream" of BP's young executives, as having "the potential to reach the highest level of management," and as rising through the corporate ranks "[f]aster than any contemporary."

For nearly two years before his death, Pescatore had held the position of Vice–President of Supply and Distribution at BP Chemicals of America. Depending on which evidence is credited, Pescatore earned total annual compensation of $118,000 to $193,000 at the time of his death. Pescatore earned W–2 compensation of approximately $121,200, consisting of a base salary of $87,200 plus a bonus for 1988 in the amount of $34,000. Pescatore also was awarded options to purchase 4,800 shares of BP stock in March 1988, exercisable at a price of Ł 2.71 per share. These options vest upon the holder's death, and may be exercised by the holder's personal representative within one year of the holder's death. In addition, Pescatore received contributions to a non-taxable savings and investment plan and other benefits. The plaintiff's expert labor economist, Dr. Edward Glaeser, estimated that the above compensation package yielded total compensation for 1988 of $193,175 (in 1988 dollars).

The plaintiff also introduced evidence as to the benefits Pescatore would have received in 1989. After being transferred to London, Pescatore was scheduled to receive a foreign service premium of $13,500 annually, a monthly spending allowance of Ł 1,484, a monthly "home base element" of $4,892, a quarterly utilities allowance of Ł 450, and free use of a furnished home in London. Based on this compensation, plus an estimated amount representing stock option awards and employer contributions to a 401(k) plan, the plaintiff's expert estimated Pescatore's 1989 earnings at $294,545 in 1989 dollars. The plaintiff's expert also estimated that, had Pescatore been promoted to the position of Senior Vice–President, he would have earned more than $600,000 per year by 1995.

Based on Pescatore's compensation in 1988 and 1989, testimony of the BP executives as to Pescatore's performance and potential, and the compensation of other executives of Pescatore's caliber who were in positions similar to Pescatore's at the time of his death, the plaintiff's expert estimated the plaintiff's lost support over the course of Pescatore's lifetime at between $25.5 million to $73.98 million in 1988 dollars. The defendant's expert, in contrast, valued the loss of support damages at approximately $2.399 million. Because sufficient evidence was presented on which a reasonable jury could base a $9 million award for loss of financial support, we hold that the district court did not abuse its discretion in denying Pan Am's motion for a new trial.

■ Pan Am offers no credible evidence that the jury was influenced by passion or prejudice. Pan Am contends that the district court treated its expert less favorably than the plaintiff's expert in questioning from the bench. But it is "unquestionably proper" for a district judge to take an active role at trial by "asking numerous and probing questions." *United States v. Manko*, 979 F.2d 900, 905 (2d Cir.1992), *cert. denied*, 509 U.S. 903, 113 S.Ct. 2993, 125 L.Ed.2d 687 (1993). A district judge "need not sit like 'a bump on a log' throughout the trial," and "has an active responsibility to insure that issues are clearly presented to the jury." *United States v. Pisani*, 773 F.2d 397, 403 (2d Cir.1985). Be-

cause the district court's questions did not rise to the level of a challenge to a witness's credibility, *United States v. Victoria*, 837 F.2d 50, 54–55 (2d Cir.1988), no error was committed, and the district court's questioning does not furnish a ground to believe that the jury was motivated by passion or prejudice. We therefore affirm the loss of financial support award.

### C. Award of Interest.

■ Pan Am next contends that the jury's $5.045 million award of prejudgment interest must be vacated and remanded because Ohio law only permits such an award if the trial court, after a post-verdict hearing, determines

> that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case.

Ohio Rev.Code Ann. § 1343.03(C). According to the Ohio Supreme Court, "it is incumbent on a party seeking an award [of prejudgment interest] to present evidence of a written (or something equally persuasive) offer to settle that was reasonable considering such factors as the type of case, the injuries involved, applicable law, defenses available, and the nature, scope and frequency of efforts to settle." *Moskovitz v. Mt. Sinai Medical Ctr.*, 69 Ohio St.3d 638, 659, 635 N.E.2d 331, 348, *cert. denied*, — U.S. —, 115 S.Ct. 668, 130 L.Ed.2d 602 (1994).

■ In this case, counsel confronted numerous vexing strategic and legal issues, the plaintiff suffered no physical injury and incurred (little or) no medical expense, and the applicable law was largely unsettled. It is thus difficult to see how prejudgment interest could be recovered under Ohio law. However, because the district court conducted the trial in accordance with federal common law, the required post-verdict hearing was not conducted, and the plaintiff had no opportunity to present evidence on the issue of settlement or to argue the issue. We therefore remand so that the district court may determine in the first instance whether interest is available to the plaintiff under Ohio law. A further issue for decision in the

first instance by the district court is whether prejudgment interest is available at all under Ohio law on an award for loss of society.

## V. *District Court Bias.*

Finally, Pan Am urges that we remand any further proceedings in this case to a different district judge because Judge Platt is biased against Pan Am. As evidence of bias, Pan Am points to the district court's reference to the prior verdict of wilful misconduct; the court's decision to silence defense counsel's efforts to mitigate the effect of the plaintiff's counsel's "blood money" remarks; the court's questioning of Pan Am's expert witness; and the court's issuance of an opinion that Pan Am construes as a broadside at two judges who prohibited or limited reference to the wilful misconduct finding in two other *Lockerbie* damage trials.

This Court has the power to remand the case to a different judge: "Federal appellate courts' ability to assign a case to a different judge on remand rests ... on the appellate courts' statutory power to 'require such further proceedings to be had as may be just under the circumstances.'" *Liteky v. United States,* 510 U.S. 540, 554, 114 S.Ct. 1147, 1156–57, 127 L.Ed.2d 474 (1994) (quoting 28 U.S.C. § 2106). To reassign a case on remand, "we need not find actual bias or prejudice, but only that the facts 'might reasonably cause an objective observer to question [the judge's] impartiality.'" *United States v. Microsoft Corp.,* 56 F.3d 1448, 1463 (D.C.Cir. 1995) (per curiam) (quoting *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 865, 108 S.Ct. 2194, 2205, 100 L.Ed.2d 855 (1988)) (alteration in original).

■ Pan Am makes an insufficient showing that Judge Platt was biased. The district court's reference to the verdict of wilful misconduct was in error, but does not show bias. Certainly, we cannot deduce bias from the district court's decision to halt defense counsel's discussion of the wilful misconduct issue. Judge Platt's issuance of the July 25, 1993 memorandum and order clarifies his reasons for permitting the references to wilful misconduct at trial. Judge Platt acted well within his discretion in questioning witnesses

from the bench. *See supra* at 21. We therefore decline to reassign this case.

## CONCLUSION

In sum, *Zicherman* embodies an intervening change in controlling law by holding that the Warsaw Convention does not require imposition of a uniform federal rule of damages that would "supersede the normal federal disposition." —— U.S. at ——, 116 S.Ct. at 636. The normal federal disposition, in the absence of a significant conflict between state law and some federal policy, is for a federal court to look to the relevant sovereign's law to give legal content to a federal cause of action. In light of this intervening change in controlling law, we are compelled to alter the law of this case and to hold that imposition of a special federal rule of damages is unwarranted, and therefore that the substantive law governing damages is determined by the choice of law principles of the forum jurisdiction.

Under applicable choice of law principles, we find that the law of Ohio furnishes the relevant substantive law governing damages. But because Ohio permits recovery for loss of society and loss of financial support, and because we find no basis for Pan Am's contention that Ohio law requires evidence of plans to remarry to be admitted, we hold that a new trial on damages is unnecessary.

We affirm the awards for loss of society and loss of financial support. We remand to the district court for further proceedings to determine whether prejudgment interest is available under Ohio law.